UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JESUS CAMACHO, surviving spouse of Stacey Camacho, and LeJEAN NICHOLS, as administratrix of the Estate of Stacey Camacho,<br><br>    Plaintiffs,<br><br>v.<br><br>NATIONWIDE MUTUAL INSURANCE COMPANY,<br><br>    Defendant. | Civil Action<br>File No.:    1:11-CV-03111-AT |

**DEFENDANT NATIONWIDE MUTUAL INSURANCE COMPANY'S
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

COMES NOW Nationwide Mutual Insurance Company and files this brief in support of its Motion for Summary Judgment, showing the Court as follows:

## STATEMENT OF MATERIAL UNDISPUTED FACTS

On July 3, 2005, Seung C. Park ("Park") drove his car through a red traffic light and collided with an automobile driven by Stacey Camacho. (Appx. A, p. 2, ¶ 7). At the time of the accident, Park had automobile insurance with Defendant Nationwide Mutual Insurance Company ("Nationwide") with policy limits of $100,000 per person and $300,000 per accident. (*Id.* at p. 3, ¶ 9). Nationwide received notice of the accident on July 5, 2005 and assigned the claim to Claims Specialist Sharon Wilson ("Wilson") for handling. (Appx. B, pp. 15 and 16; Appx. C, p. 36). Wilson immediately obtained the accident report, which revealed that Park

had been cited for the accident and arrested for suspicion of driving under the influence. (Appx. C, p. 37; Affidavit of Sharon D. Wilson, attached hereto as Exhibit "A", ¶ 5; *see also* Appx. D). Nationwide also interviewed Park through the use of a Korean translator because English is not Park's first language. (Appx. C, pp. 38 and 39). Park denied any liability for the accident, claiming he had a green light when he entered the intersection. He also denied he was intoxicated.[1] (*Id.* at p. 38; Appx. D, p. 50, ¶ 6). Wilson initially determined that liability was likely adverse to Park, but that she needed to obtain the results of his blood alcohol test before making a final liability determination (*Id.*).

On July 11, 2005, Wilson sent Park a letter via certified mail, advising him that the damages caused by the accident (the death of Stacey Camacho) may exceed his available insurance under his Nationwide policy (known as an "excess letter.") (Appx. B, p. 17; Appx. E). Approximately one week after the accident, Wilson met with Stacey's husband, Jesus Camacho ("Camacho"), and her mother, LeJean Nichols ("Nichols"), at Nichols' home. (Appx. B, pp. 18-19; Appx. F, pp. 61-62). Wilson expressed her condolences to the Camacho family and explained the claims

---

[1] A court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be "reduced to admissible evidence at trial" or "reduced to admissible form" such as if a statement falls within an exception to the hearsay rule. *Lentz v. Hospitality Staffing Solutions*, LLC, 2008 WL 269607, at *3 (N.D. Ga. Jan. 28, 2008) Under federal hearsay rules, "if the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and [so] the statement is not hearsay." FED. R. EVID. 801(c) advisory committee's notes. Statements which prove someone's knowledge or what someone heard, rather than the truth of the matter asserted, can be considered as admissible non-hearsay evidence. *Lentz, id.* at *10. Here, Park's statements are not offered to prove the truth of the matter asserted, i.e., whether Park was really under the influence of alcohol at the time of the accident; rather, these statements are offered to show that this statement was made to Nationwide and to show Nationwide's knowledge or understanding that Park denied liability for the accident.

handling process. (Appx. B, p. 19). At that meeting, Wilson learned Stacey's vehicle was insured with GEICO with underinsured motorist limits of $50,000 per person, $100,000 per accident. (*Id.* at pp. 20 and 21).

Upon completing her preliminary investigation, Wilson determined that the value of the claim likely exceeded Park's $100,000 limits. (*Id.* at pp. 26-27; Appx. C, p. 40). She also determined that, under Georgia law, the underinsured motorist coverage under Stacey's GEICO policy should not apply because it did not exceed Park's liability coverage. (Appx. C, p. 41; Appx. B, pp. 22-23 and 24-25). On August 25, 2005, Wilson requested $100,000 in settlement authority from her supervisor in order to settle the estate claim and wrongful death claim for a full release. (Appx. B, pp. 26-27).[2] Prior to approving Wilson's authority request, Wilson's supervisor's indicated that additional information was needed to confirm the marital status of Stacey and Jesus (i.e., were they legally married and Jesus was the surviving spouse entitled to pursue a wrongful death claim) and to confirm the probate status of Stacey's Estate (i.e., was the estate created and, if so, who was the Administrator). (Appx. C, p. 43; Appx. D, p. 50, ¶ 8). Insurers often and routinely request this information in order to verify they are settling with the proper claimants. (Appx. G, p. 68; Appx. H, pp. 76-77). Nationwide also needed to confirm the existence and amount of any hospital liens to ensure they were resolved as part of the settlement.

---

[2] When an accident results in a fatality, two claims arise against the tortfeasor: (1) a claim by the Administrator of the decedent's estate for the decedent's medical bills and funeral expenses under O.C.G.A. § 51-4-5 ("estate claim"); and (2) a claim by the surviving spouse, or if none, the surviving child or surviving parents, for the wrongful death of the decedent ("wrongful death claim"). O.C.G.A. § 51-4-2.

(Appx. D, p. 50, ¶ 7) O.C.G.A. § 44-14-470. On August 26, 2005, Wilson wrote to Nichols asking for this information, including requests for copies of Stacey's medical bills, death certificate, and any medical lien letters (Appx. B, pp. 28-29, Appx. I).

After learning that Stacey had incurred $54,186 in medical bills at the Gwinnett Medical Center and $5,723.70 in funeral expenses, Wilson again requested settlement authority on October 24, 2005 for the full policy limits. (Appx. D. p. 50, ¶ 9). This request was approved on October 27, 2005. (*Id.* at p. 51, ¶ 10; Appx. C, pp. 42 and 43). Wilson followed up with the Nichols/Camacho family in November 2005 to discuss settlement, but they indicated they were not ready to discuss settlement at that time. (Appx. D, p. 51, ¶ 10). After the holiday season (February 2006), Wilson again called Camacho and Nichols and arranged to meet with them. (Appx. C, p. 44).

On February 13, 2006, Wilson met with Nichols and Camacho at Nationwide's office in Duluth, Georgia. (Appx. J, p. 83; Appx. F, p. 63; Appx. C, p. 45; Appx. B, p. 30-31).   At that meeting, Wilson offered Camacho and Nichols $100,000 to settle the estate and wrongful death claims in exchange for a general release. (Appx. J, p. 83; Appx. F, p. 64-65; Appx. B, p. 32). Wilson presented Nichols and Camacho with a check for approximately $97,000 and explained the remainder would pay Stacey's outstanding medical bills or hospital liens.[3] (Appx. J, p. 84; Appx. F, pp. 64-65). Camacho and Nichols decided to consult with an attorney before accepting the offer. (Appx. J, pp. 85-86; Appx. F, pp. 65-66).

---

[3] The $56,124 Gwinnett Medical Center bill was ultimately reduced to $784.80 on February 8, 2006 following payment by Stacey's health insurance. (Wilson Dep. Ex. 1, NW000279).

On March 2, 2006, Nationwide received two letters from attorney Charles McAleer ("McAleer") indicating that he represented Jesus Camacho, individually, and the Estate of Stacey Camacho. (Appx. B, pp. 33-34, Appx. K). No settlement demand was made in these letters. (*Id.*).

On March 28, 2006, Wilson discussed the claims (the estate and wrongful death claims) with McAleer on the phone and offered to settle the claims for the full policy limits of $100,000 in exchange for a full release. (Appx. D, p. 51, ¶ 11; Appx. L, p. 92). McAleer indicated his clients would settle for a limited liability release only. (Appx. C, p. 46; Appx. D, p. 51, ¶ 11). Wilson explained that a limited release was not appropriate because there was no applicable underinsured motorist coverage. (*Id.*; Appx. L, p. 92). McAleer continued to refuse a general release without providing a reason for his refusal. (Appx. C, p. 46; Appx. D, p. 51, ¶ 11). Wilson sent McAleer a letter dated March 28, 2006, confirming Nationwide's $100,000 offer to settle the wrongful death and estate claims for a full release. (Appx. L, p. 93; Appx. M). She also requested a copy of the documents confirming the creation of Stacey's Estate. (Appx. L, p. 94; Appx. M).

On April 18, 2006, McAleer wrote Nationwide offering to settle the claim or claims (it is not clear from the letter whether the offer was to settle all claims) for the $100,000 policy limits and purported to leave the offer open for ten days (hereinafter referred to as "demand letter" or "time-limited demand"). (Appx. B, p. 35; Appx. N). The demand letter begins by reiterating that McAleer represents both Jesus Camacho

and the Estate of Stacey Camacho. The demand letter's subject line defines "our client" as "Jesus Camacho, the Estate of Stacey Camacho." (Appx. N, p. 99). The demand letter lists special damages belonging to Stacey's Estate (medical expenses) as well as general and punitive damages as part of Camacho's wrongful death claim. (Appx. N, p. 101).

Despite that the demand letter begins by stating McAleer represents both Camacho and the Estate, the offer states "we hereby offer to settle the **claim of Jesus Camacho** for the policy limits of $100,000.  We are making this offer of settlement on behalf of our **client** now to allow you to make a full, comprehensive evaluation of the facts and circumstances underlying this claim." (emphasis added) (*Id.*).  Any offer to settle contained in the letter referenced only the claim of Jesus Camacho.

McAleer conditions the offer to settle with Jesus Camacho on acceptance of several "general" terms, including: (1) issuing the check only in the names of Jesus Camacho and Charles McAleer; (2) prohibiting reductions, setoffs, and withholdings from settlement funds unless expressly communicated in writing before acceptance of the offer; (3) settlement was contingent upon McAleer's approval of the release language; and (4) no indemnity or hold harmless agreements. (Appx. N, p. 102). The demand letter states that the offer is open for ten days, but never clarifies whether ten days is to be calculated from the date of the letter or date of receipt. (*Id.*). The letter states that the offer is being made per Georgia's Unliquidated Damages Act, which gives an insurer thirty days to respond to a demand, not ten. O.C.G.A. § 51-12-14.

Wilson received the demand letter on April 20, 2006 and calendared a response for May 1, 2006, the first business day, ten days from the date of receipt (the tenth day fell on the weekend) (Appx. L, p. 95).

McAleer also sent a separate letter to Park on April 18, 2006 via certified mail. (Appx. D, p. 51, ¶ 13; Appx. Y). In contrast to his letter to Nationwide, McAleer's letter to Park identifies "our client" as "Jesus Camacho ***for*** the Estate of Stacey Camacho" (contrasted with "Jesus Camacho, the Estate of Stacey Camacho"). (Appx. Y). McAleer's letter to Park vaguely demands that Park settle "the above-referenced claim" for $100,000 and never specifies whether the "claim" to be settled is the estate or wrongful death claim or both. (*Id.*). McAleer's letter to Park also enclosed a copy of the demand letter. (*Id.*). Nationwide was sent and received a copy of the letter(s) to Park. (Appx. D, p. 51, ¶ 13).

On May 1, 2006, Wilson contacted Park to discuss the claim status and he referred her to a Korean translator to discuss the claim. (Appx. C, p. 47 and 48). Wilson attempted to contact the translator but was unsuccessful. (*Id.*). At this time, Wilson also met with her claims manager, Mitch Parham, and Nationwide's in-house legal counsel, Russ Roddy. (Appx. L, p. 96). After this meeting, Wilson determined that a limited liability release was not appropriate because there was no applicable uninsured/underinsured motorist coverage and that a general release would provide the most protection to Park due to the risk of remaining claims against him. (Appx. D, p. 52, ¶ 14). On May 1, 2006, Wilson faxed and mailed a letter response to

McAleer confirming that Nationwide had previously tendered the $100,000 policy limits. (Appx. L, p. 97; Appx. O). Wilson explained that a limited liability release did not apply to this claim and offered to settle for a general release. (*Id.*). She also requested a copy of the Camachos' marriage certificate to verify that Jesus was the surviving spouse and rightful claimant, asked McAleer to clarify the status of Stacey's Estate, and asked for copies of any Letters of Administration for Stacey's Estate as previously requested in her March 28, 2006 letter. (*Id.*; Appx. D, p. 52, ¶ 16). She also asked McAleer to provide her with his tax identification number so that she could process the $100,000 settlement check. (*Id.*).

On May 5, 2006, Wilson spoke with Park's personal attorney, Kip Shepherd, about the issues surrounding McAleer's demand, including the type of release. (Appx. C, p. 48). After confirming with Shepherd that Park wanted the matter settled for a general release, Wilson made two phone calls to McAleer on May 12, 2006, but he did not take or return her calls. (*Id.*; Appx. D, p. 53, ¶ 17). Wilson left messages to "work out few lose [sic] ends in order to issue the settlement check," but McAleer never called back. (*Id.*). Wilson wrote to McAleer that day reiterating that Nationwide "is prepared to issue it's $100,000 liability check" and again requested copies of the marriage certificate and estate documents. (Appx. D, p. 53, ¶ 18; Appx. Z). Wilson spoke with Park's attorney again on May 16, 2006 and learned that Park would now accept a limited liability release upon receipt of the marriage certificate

and clarification on the status of Stacey's Estate. (Appx. D, p. 53, ¶ 19). Wilson confirmed this in a letter to Park's attorney dated May 17, 2006. (*Id.;* Appx. AA).

On June 9, 2006, Wilson wrote McAleer a fourth time notifying him that Park and Nationwide now agreed to settle the claims against Park for a limited liability release and again requested copies of the marriage certificate and estate documents. (Appx. D, p. 54, ¶ 20; Appx. BB). McAleer again failed to respond. (Appx. D, p. 54 ¶ 21). Wilson did not receive any sort of response from McAleer until June 26, 2006, when he sent her a facsimile stating that her "proposal from May 1, 2006 is under consideration. I would greatly appreciate your continued patience." (Appx. Q).

While lulling Nationwide into the belief that he was considering settlement, McAleer was actually preparing to file suit against Park (so as to get a judgment and eventually file the case at bar against Nationwide), as evidenced by the revised complaint McAleer received from co-counsel on June 29, 2006. (Appx. P, p. 111; Appx. R). McAleer filed suit against Park on July 25, 2006 without the courtesy of notifying Nationwide or providing it with a copy of the complaint. (Appx. A, p. 5, ¶ 23; Appx. D, p. 54, ¶ 22). That lawsuit ultimately resulted in a $5.83 million dollar jury verdict against Park, who then executed an assignment of his claims in favor of Plaintiffs. (Appx. A, p. 6, ¶ 24).  Plaintiffs then filed the case at bar.

<u>ARGUMENT AND CITATIONS OF AUTHORITY</u>

I.   <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is proper where there is no genuine issue of any material

fact and the movant is entitled to judgment in its favor as a matter of law. FED. R. CIV. P. 56. When the non-movant bears the burden of proof at trial, the movant may carry its burden at summary judgment by demonstrating the absence of evidence supporting an essential element of the non-movant's claim. *Wise v. Hartford Life and Accident Ins. Co.*, 360 F. Supp. 2d 1310, 1316 (N.D. Ga. 2005). Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-movant will be unable to prove his case at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).

## II.      SUBSTANTIVE GEORGIA LAW IS APPLICABLE

This case is before the Court based on diversity jurisdiction. 28 U.S.C. § 1332(a). A federal court sitting in diversity must apply the substantive law of the state in which the court sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817 (1938). Accordingly, Georgia law applies.

## III.    NATIONWIDE ACTED REASONABLY AND IN GOOD FAITH IN HANDLING THE CLAIMS AGAINST ITS INSURED

### A.      Reasonably Prudent Insurer Standard

The undisputed evidence shows that Nationwide handled the claims against its insured, Park, as any reasonably prudent insurer. As recognized by the Georgia Supreme Court in *Southern Gen. Ins. Co. v. Holt*, "an insurance company may be liable for damages to its insured for failing to settle the claim of an injured person where the insurer is guilty of negligence, fraud, or bad faith in failing to compromise the claim. 262 Ga. 267, 268 (1992). Earlier this month, in *Baker v. Huff*, 2013 WL

3358027 (Ga. App. July 5, 2013), the Georgia Court of Appeals succinctly set forth the applicable bad faith standard:

> [W]hether the basis for imposing tort liability on the insurer is phrased in terms of bad faith or negligence, an insurer may be liable for damages for failing to settle for the policy limits 'if, but only if, such ordinarily prudent insurer would consider that choosing to try the case would be taking an unreasonable risk. 2013 WL 3358027, at *4.

The insurer's actions must be judged by the standard of the ordinarily prudent insurer. *Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 685 (2003). Whether an insurance company acts in bad faith in refusing to settle depends on "whether the insurance company acted reasonably in responding to a settlement offer," bearing in mind that, in deciding whether to settle, **the insurer must give equal consideration to the insured's interest as to its own**. *Fortner v. Grange Mut. Ins. Co.*, 286 Ga. 189, 189 (2009) (emphasis added). The issue for the court to decide is whether there is sufficient evidence showing the insurer acted reasonably as a matter of law. *Holt*, *id*. at 269. The facts here prove that Nationwide acted reasonably as a matter of law.

### B.  <u>Nationwide Handled the Claims as a Reasonable Insurer Would</u>

Count I of Plaintiffs' Complaint alleges negligence and bad faith against Nationwide, in part, for its alleged "failure to handle the Camacho Claims with ordinary care." This Court has held, however, that an allegation of improper claims handling is a breach of contract claim, <u>**not**</u> a tort claim. *Arrow Exterminators, Inc. v. Zurich Am. Ins. Co.*, 136 F. Supp. 2d 1340, 1354-5 (N.D. Ga. 2001). Therefore, to the extent Count I of Plaintiffs' Complaint alleges claims for negligence based on alleged

improper claims handling, Plaintiffs have not alleged a claim against Nationwide upon which relief can be granted. *See Tate v. Aetna Cas. & Sur. Co.*, 149 Ga. App. 123 (1979) (aff'ing dismissal of tort claims against insurer).

Further, the evidence here shows that Nationwide handled the claim as any reasonable insurer would. In judging an insurer's conduct by the standard of an ordinarily prudent insurer, decision-makers often rely upon expert testimony.[4] *See, e.g., Holt, supra.* In this case, Nationwide's expert, Peter Hildebrand, and Plaintiffs' proffered expert,[5] Peter Knowe, agree that Nationwide properly handled the initial investigation stage of Plaintiffs' claims against Park. (Appx. H, p. 78; Appx. S, p. 134).[6] Knowe admits that Nationwide properly handled the claims from their inception on July 5, 2005 up until Nationwide received McAleer's April 18, 2006 letter. (Appx. H, p. 78).  Nationwide's conduct during this time period is therefore not at issue, except to the extent it reflects that Nationwide had offered its policy limits in a repeated effort to settle the claims and protect its insured. To the extent Plaintiffs claim Nationwide's conduct deviated from reasonable claims handling sometime after April 18, 2006, such as via its communications with its insured during the pendency of the claim and the demand, no such evidence exists. According to Peter Hildebrand[7], Nationwide's communication with Park during the handling of

---

[4] Where, however, the evidence is clear that the insurer did not act in bad faith, expert testimony is not required. *Baker*, 2013 WL 3358027, at *6, n.4

[5] Nationwide disputes Peter Knowe is qualified to testify as an expert and has filed a Motion to Exclude Report and Testimony of Peter Knowe contemporaneously herewith.

[6] In his proffered report, Mr. Knowe acknowledged that "Nationwide correctly offered the available policy limits of $100,000 on or about March 28, 2006 to counsel for Camacho." (Appx. T, p. 169).

[7] Mr. Hildebrand has previously been qualified as an expert on claims handling practices in the United States District Court for the Northern District of Georgia – Atlanta Division. *State Nat. Ins. Co. v. Access General Agency, Inc.*,

settlement discussions was consistent with industry standards, particularly with respect to the time-limited demand. Insurance companies are not required (either by industry standard or policy terms) to notify an insured of a settlement demand and normally do not do so if the insured has already been notified of the demand by a third party (i.e., by receiving a copy of the demand directly from the claimant's attorney). (Appx. G, pp. 69 and 70). Georgia law does not require insurers to notify policyholders of a settlement opportunity. O.C.G.A. § 33-6-30 *et seq.* In fact, under Georgia's Unfair Claims Settlement Practices, an insurer is only required to provide an explanation of its decision to decline a settlement offer when insured makes a request in writing. O.C.G.A. § 33-6-34(10). Most insurance policies, including Park's Nationwide policy, allow the insurer to settle claims against the policyholder on its own.  (Appx. U, p. 217; see also Appx. H, p. 79).[8] The only situation where an insurer is arguably required to notify the insured of a settlement offer is when the demand exceeds the insured's available coverage.  In that case the insurer should notify the insured that he faces personal exposure, as Nationwide did very early in this claim (in its July 11, 2005 letter to Park). (Appx. G, p. 71; Appx. E).

When Nationwide received McAleer's April 18, 2006 letter, it was aware that McAleer had already notified Park of the settlement offer by providing him with a

---

Not Reported in F.Supp.2d, 2007 WL 4563860, N.D.Ga., August 22, 2007 (NO. 1:04-CV-2594-JTC).

[8] As observed by this Court, a liability insurer "may, in good faith and without notification to others, settle part of multiple claims against its insured even though such settlements deplete or exhaust the policy limits so that remaining claimants have no recourse against the insurer." *Arrow Exterminators*, 136 F. Supp. 2d at 1355. Thus, an insurer can – in good faith – settle claims against the insured without notifying him even if such settlement leaves him exposed to additional claims. Here, Nationwide tried to settle **all** claims against Park.

copy via certified mail. (Appx. D, p. 51, ¶ 13). Nationwide had previously tendered the policy limits long before any demand was received from the Plaintiffs and long before the Plaintiffs even hired an attorney.  Nationwide always expected to settle for the policy limits and never made any attempt to settle for anything less than the policy limits. (Appx. D, p. 52, ¶15). Based on the industry custom and standards outlined above, Nationwide's communications with Park reflect what a reasonable insurer would do in the same or similar situation. (Appx. G, p. 72).

## IV.   NATIONWIDE ACTED REASONABLY AND IN GOOD FAITH IN ATTEMPTING TO SETTLE THE CLAIMS AGAINST ITS INSURED

### A.   Nationwide Acted Promptly to Settle the Claim

Nationwide tried to settle for the policy limits even before claimants made a settlement demand. In *Southern General Ins. Co. v. Wellstar Health Systems, Inc*, 315 Ga. App. 26, 31 (2012), the Court of Appeals stated that an insurance company can create a "safe harbor" from liability under *Holt* and its progeny when (1) the insurer promptly acts to settle a case involving clear liability and special damages in excess of the applicable policy limits, and (2) the sole reason for the parties' inability to reach a settlement is the plaintiff's unreasonable refusal to assure the satisfaction of any outstanding hospital liens.

If failure to come to terms on hospital liens is a legitimate safe harbor, the issues in this case, which include liens *and* other matters also qualify as a "safe harbor."  The issues to be resolved related to the appropriate party to make the claims

(the husband, the child, or the Estate), the liens, and the terms of the release, which were all issues beyond Nationwide's control. Nationwide had previously requested the estate documents from McAleer to confirm the rightful claimants. (Appx. M). Per McAleer's letter, settlement was contingent upon his approval of the release language. (Appx. N, p. 102). By tendering the policy limits to McAleer, Nationwide resolved the one (and only) portion of the demand over which it had control, thereby creating a safe harbor from claims of bad faith. *Brightman,* 276 Ga. at 686.

## B.   A Reasonably Prudent Insurer Could Not Have Accepted McAleer's Conditional Demand

In order to establish bad faith for failure to settle, Plaintiffs must show, at a minimum, that settlement was possible. *Delancey v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1550 (11th Cir. 1991); *ACCC Ins. Co. v. Carter*, 621 F. Supp. 2d 1279, 1284 (N.D. Ga. 2009). Where settlement is not a possibility, the insurer is entitled to summary judgment on claims for negligent or bad faith failure to settle. *See Govt. Employees Ins. Co. v. Gingold*, 249 Ga. 156 (1982). In this case, Nationwide cannot be held liable for failure to settle because settlement upon the terms in McAleer's demand letter was legally impossible and in violation of Nationwide's duties to protect its insured.

### 1.   McAleer's Settlement Offer was Incapable of Acceptance.

A prerequisite to the validity of any settlement agreement is that the offer to settle be "an offer capable of acceptance." *Herring v. Dunning*, 213 Ga. App. 695,

697 (1994). If the offer is so indefinite as to make it impossible for a court to decide just what it means and to fix the legal liability of the parties, its acceptance cannot result in an enforceable agreement. *Id.* "Settlement" is defined as an agreement by which parties having disputed matters between them reach or ascertain what is coming from one to the other. *Id.*

Here, McAleer's demand letter was so vague that Nationwide could not ascertain whether it was an offer to the settle the wrongful death claim, the estate claim, or both. McAleer's letter begins by stating that he represents both Jesus Camacho and the Estate of Stacey Camacho, but the actual demand states "we hereby offer to settle the claim of Jesus Camacho for the policy limits of $100,000." (Appx. N, p. 101). Jesus Camacho was not the administrator of Stacey's Estate. (Appx. P, p. 112). Nationwide had concerns about whether Jesus Camacho and Stacey Camacho were legally married. (Appx. D, p. 50, ¶ 8). Thus, on its face, the offer appears to be for Jesus Camacho's unsubstantiated claim[9] and not for the Estate's claim.

McAleer's letter lists Stacey's medical expenses as an element of the demand, but a claim for medical expenses belongs to the Estate and not to a possible spouse or heir. (Appx. P, p. 113); O.C.G.A. § 53-7-45; O.C.G.A. § 51-4-5(b). However, an Estate had not been established for Stacey at the time of the demand. (*Id.* at p. 114). McAleer advised that the settlement proceeds would be held in trust until the court approved the Estate, implying the demand may have been on behalf of the Estate, but

---

[9] Jesus Camacho was not involved in the accident.

McAleer instructed Nationwide to issue the settlement check only in the name of Jesus Camacho (again, not the Administrator of Stacey's Estate), implying the demand was not also on behalf of the Estate. (Appx. N, p. 102). The above paragraph alone points to five (5) inconsistent statements in McAleer's letter regarding who was actually making the demand – Jesus Camacho, Stacey's Estate, or both?[10]

Because this offer was so unclear, no binding agreement could have been reached even if Nationwide responded with an all-encompassing "yes." Would "yes" have meant claims by Jesus Camacho individually were resolved? Or as Administrator of a to-be established estate? Or as surviving spouse? Or some combination thereof? How could anyone represent that Jesus Camacho would be appointed Administrator of the Estate by an unknown Probate Court Judge? Therefore, because settlement as outlined by McAleer was in fact not enforceable, Nationwide cannot be held liable for failure to accept the purported offer and is entitled to judgment as a matter of law. *See Gingold, supra; see also Baker, supra*.

## 2. Nationwide Had No Duty to Settle the Demand in Excess of the Policy Limits.

As noted just this month by the Georgia Court of Appeals, an insurer has no duty to engage in negotiations concerning a settlement demand that is in excess of the policy limits. *Baker, supra* at *5. *Baker* addressed a demand to settle only the injured

---

[10] The Georgia legislature recently enacted O.C.G.A. § 9-11-67.1, effective July 1, 2013, which requires settlement demands to specifically list the claims to be released because it is a "material term" of the settlement offer.

party's pain and suffering claim for the policy limits. The Court held that an offer to settle only part of the claim was not a demand within policy limits:

> This was not an offer to fully settle a claim within the policy limits to which Liberty Mutual had a duty to respond under *Holt* [cits omitted]. Rather, the...offer to settle only pain and suffering damages for the policy limits, in effect, invited Liberty Mutual to engage in negotiations to fully settle the claim, which included additional damages for medical expenses and lost wages, for an amount in excess of the policy limits... Liberty Mutual had no duty 'to engage in negotiations concerning a settlement demand that is in excess of the insurance policy's limits.'

McAleer's letter purportedly offered to settle Jesus Camacho's wrongful death claim for the policy limits, leaving the estate claim against Park open. Nationwide was aware that Stacey's Estate had a claim for funeral expenses totaling $5,723.70 as well as outstanding medical bills. (Appx. D, p. 50, ¶ 9). Similar to *Baker*, the offer in the case at bar was essentially an offer to settle for at least $105,723.70 ($100,000 on the wrongful death claim plus at least $5,723.70 for the estate claim), an amount in excess of the policy limits, a demand to which Nationwide had no duty to respond.

## C. A Reasonably Prudent Insurer Would Not Have Accepted McAleer's Demand Within the Time Permitted

### 1. The Six-Day Time Frame Was Unreasonable.

Even assuming McAleer's offer was capable of acceptance, a prudent insurer would not have accepted the terms of McAleer's demand. First, as a matter of law, the purported ten-day time frame was unreasonably short under these circumstances

18

and did not provide enough time for Nationwide to properly address the issues raised by the vague terms of the demand. Plaintiffs acknowledge there was no significance to the ten-day time frame (i.e., nothing was happening in ten days so as to need the settlement proceeds within that time frame)(Appx. V, p. 239; Appx. W, p. 241). Further, after mailing days and weekends are factored in, the purported ten-day demand was at most a six business day demand. The demand never specified whether the response was supposed to be measured from the date of the letter or the date of receipt, so it was not clear when the offer expired.[11] The demand letter also purports to be a demand under O.C.G.A. § 51-12-14, Georgia's Unliquidated Damages Act, which gives thirty days to respond, not ten, or six.

There is no statutory time period in Georgia that gives an insurer fewer than thirty days to respond to any settlement demand. O.C.G.A § 33-4-6 provides a minimum of 30 days to respond to first-party demands.  O.C.G.A. § 33-7-11 provides a minimum of 60 days to respond to uninsured motorist demands.  More importantly, O.C.G.A. § 9-11-67.1, effective July 1, 2013, now provides 30 days to respond to an automobile death demand.  Ten days, particularly under these circumstances, should be unreasonable as a matter of law.

Even though Nationwide had already tendered its limits, the six-day demand was not a reasonable deadline given the unresolved issues the letter raised. In responding to a time-limited settlement demand, an insurer "is not required to accept

---

[11] To avoid this confusion, recently-enacted O.C.G.A. § 9-11-67.1 gives insurers a minimum of thirty days to respond to a settlement demand, measured from the date of receipt.

an offer which, under all the circumstances, imposes an unreasonable short period of time to respond." *Baker*, *supra*, at *7. In *Baker*, the Court of Appeals found that the insurer did not act in bad faith as a matter of law in refusing to respond within the demand's ten-day time limit when the demand failed to include the necessary documents the insurer needed to evaluate the claim. *Id.* Similarly, in this case, despite Nationwide's prior requests, McAleer's demand did not include the marriage certificate and estate documents needed to verify that Jesus Camacho was the rightful claimant and to evaluate the claim. Furthermore, the demand letter did not address how to resolve any hospital liens and expressly prohibited addressing the same. Viewed in this factual context, the six-day time frame did not provide enough time for Nationwide to ensure the settlement offer would adequately protect its insured. Given McAleer's refusal to provide Nationwide with the information it needed, the demand left Nationwide "with no reasonable option" but to respond with an offer to settle all claims with a general release. *See Baker, id.* at *6.

### 2. An Acceptance of McAleer's Demand Would Have Left Nationwide's Insured Exposed to Additional Claims.

A reasonable insurer would not have accepted McAleer's demand for the additional reason that it left the insured open to the risk of additional claims. The offer only resolved Camacho's wrongful death claim, leaving the estate claim pending. A prudent insurer in Nationwide's position would conclude that it was in the insured's best interests to resolve both the wrongful death claim and the estate claim rather than settling just one claim. (Appx. S, p. 142). Furthermore, the demand

letter did not address how to resolve any hospital liens and expressly prohibited indemnity, reductions, and set-offs, leaving Park exposed to claims by Stacey's medical providers. O.C.G.A. §§ 44-14-470; 44-14-473. Nationwide acted reasonably in requesting proof of the Camachos' marriage to verify Jesus was the surviving spouse and rightful claimant. (Appx. H, pp. 76-77). Absent this proof, an insurer could be putting its policyholder at risk of settling with the wrong claimant. (Appx. G, p. 73).

> **3.    McAleer's Demand Was Purposefully Crafted Such That No Reasonable Insurer Could or Would Have Accepted the Demand.**

Georgia courts recognize, and have cautioned against, the possibility that a time-limited demand can be used to "set-up" an insurance company for bad faith failure to settle. *Holt*, 262 Ga. at 269. Several aspects of McAleer's purported demand expose his letter as nothing more than a set-up. McAleer's fee agreement with Jesus Camacho was specifically structured around recovering an excess judgment against Nationwide. The typed fee agreement, signed by Camacho on February 28, 2006, was revised (in handwriting) to state that McAleer shall recover a portion of proceeds in excess of $100,000 "should [the] $100,000 offer by insurer be construed as an offer to settle this estate claim." (Appx. P, p. 115, Appx. X). The only reasonable interpretation of this provision is that McAleer intended to obtain a counter-offer from Nationwide in order to posture this case for an excess judgment, likely related to the Estate versus wrongful death claim issues discussed above. The

21

letter was intentionally vague as to which claims would be released and when the offer expired.[12]  If Nationwide had agreed to settle just the wrongful death claim, Nationwide would be accused of bad faith for failing to settle the Estate claim. If Nationwide had offered to settle both the wrongful death and Estate claims, that response would have been deemed a counter-offer since McAleer's letter offered to settle Camacho's claim only. Either way Nationwide responded, it was always going to be construed as a rejection.

The letter was likewise intentionally unclear as to when the offer expired, suggesting that the aim was to create a *Holt* "gotcha" moment if Nationwide failed to respond in time. The offer never specified whether the deadline was to be calculated from the date of the letter or the date of receipt. There was absolutely no significance to the ten-day time limit, and when weekends and mailing days are factored in, it was really a six-day demand. (Appx. V, p. 239; Appx. W, p. 241). Even after Nationwide responded, McAleer indicated he was considering settlement when in reality he was preparing to file suit. The undisputed evidence is that Nationwide offered to settle the claims for the policy limits before the demand, in response to the demand, and after the demand. It should not be held liable for bad faith simply because it was set up to respond to an impossible offer.

### D.    Nationwide Gave Equal or Greater Consideration to Park's Interests Than Its Own in Attempting to Settle the Claims

---

[12] McAleer himself admits the demand letter is vague in this regard. (Appx. P, p. 116 and 117).

Whether an insurer acts in bad faith in refusing to settle depends on whether the insurer acted reasonably in responding to a settlement offer, bearing in mind that the insurer must give the insured's interests the same consideration it gives its own. *Fortner*, 286 Ga. at 190, *citing Brightman*, 276 Ga. at 685-6. Applying Georgia's equal consideration rule, Nationwide clearly not only gave Park's interests equal consideration to its own, but in fact, put Park's interests ahead of its own in trying to settle the claims for a general release. A general release provides greater protection to a tortfeasor than a limited liability release. A limited liability release only provides limited protection because it still enables the claimant to file suit against the tortfeasor in order to pursue other applicable insurance, including uninsured/underinsured ("UM/UIM") motorist coverage, and allows for the claimant's UM/UIM carrier to file a subrogation action against the tortfeasor. O.C.G.A. § 33-24-41.1. Nationwide received no benefit in requesting a general release over limited liability release, but Park did. (Appx. G, p. 74). Regardless of what release was used, Nationwide intended to pay its $100,000 limits. Therefore, in negotiating for a general release, Nationwide gave greater consideration to its insured's interests rather than its own. (*Id.* at ln. 6-14).

It is even more evident that Nationwide's actions do not constitute bad faith when contrasted with the insurer's conduct in *Holt*. Whereas the insurer in *Holt* ignored settlement efforts, Nationwide actively pursued settlement from the inception of the claim, even before any demand by the claimants. Wilson offered the policy

limits on a least two separate occasions before the formal demand was ever made, even going so far as to present a check to the Plaintiffs at their first meeting (Appx. J, p. 84; Appx. F, pp. 64-65). She made several requests for the supportive documents before the time-limited demand was made. (Appx. I; Appx. M). *Holt* involved rather egregious conduct by the insurer, yet the Court found that the issue of bad faith was a jury question. If the insurer's conduct in *Holt* only amounted to a question of bad faith, then Nationwide's actions do not constitute bad faith as a matter of law.[13]

## V.   PLAINTIFFS ARE NOT ENTITLED TO RECOVER ATTORNEY FEES AND LITIGATION EXPENSES

Plaintiffs are not entitled to recover attorney fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11 because there is no evidence Nationwide has acted in bad faith, been stubbornly litigious, or caused Plaintiffs unnecessary trouble and expense. As used in this statute, "bad faith" means any frivolous and unfounded purpose in law or in fact. *American Family Life Ass. Co. of Columbus v. U.S. Fire Co.*, 885 F.2d 826, 833 (11th Cir. 1989). Bad faith damages are not recoverable under O.C.G.A. § 13-6-11 where there exists a bona fide dispute. *Id. citing Jeff Goolsby Homes Corp. v. Smith*, 168 Ga. App. 218 (1983). As discussed above, there is no evidence Nationwide acted in bad faith, either in the underlying case or the case at bar, so litigation expenses and attorney fees are not warranted. At the very least, a

---

[13] A court may find that an insurer acted reasonably as a matter of law without reference to expert testimony "when the issues concerning a professional's conduct are not of a complicated nature, and a violation [or absence of a violation] is established by clear and palpable proof." *Baker*, 2013 WL 3358027, at *7, n.4. Here, the fact that Nationwide twice offered the policy limits before the demand is common sense proof that Nationwide did not act in bad faith as a matter of law.

bona fide dispute exists between Plaintiffs and Nationwide as to whether Nationwide is liable for sums in excess of its $100,000 policy limits.

## CONCLUSION

This is not a case where Nationwide failed to respond to a settlement demand or offer its limits. Instead, Nationwide worked to resolve the outstanding issues related to the appropriate claimant and the scope of the release. Nationwide acted as any reasonable insurer would in promptly tendering its limits and working to secure a release that afforded its insured the most protection. No reasonable trier of fact could conclude that Nationwide acted unreasonably under these circumstances. Accordingly, Nationwide is entitled to summary judgment on Counts I and II of Plaintiffs' Complaint.

This 15th day of July, 2013.

Goodman McGuffey Lindsey & Johnson, LLP
Attorneys for Nationwide Mutual Insurance Company

By:   *s/Stephanie F. Glickauf*
ROBERT M. DARROCH
GA State Bar No.  205490
rdarroch@gmlj.com
STEPHANIE F. GLICKAUF
GA State Bar No.  257540
sglickauf@gmlj.com
3340 Peachtree Road NE, Suite 2100
Atlanta, GA 30326-1084
Phone:  (404) 264-1500
Fax:   (404) 264-1737

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JESUS CAMACHO, surviving spouse of Stacey Camacho, and LeJEAN NICHOLS, as administratrix of the Estate of Stacey Camacho, | |
| | Civil Action File No.:   1:11-CV-03111-AT |
| Plaintiffs, | |
| v. | |
| NATIONWIDE MUTUAL INSURANCE COMPANY, | |
| Defendant. | |

## CERTIFICATE OF COMPLIANCE

The foregoing document is double spaced in 14 point Times New Roman font

and complies with the type-volume limitation set forth in Local Rule 7.1.

s/STEPHANIE F. GLICKAUF
Stephanie F. Glickauf
Goodman McGuffey Lindsey & Johnson, LLP
3340 Peachtree Road NE, Suite 2100
Atlanta, GA 30326-1084
Phone:  (404) 264-1500
Fax:     (404) 264-1737
Email:  sglickauf@gmlj.com

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JESUS CAMACHO, surviving spouse of Stacey Camacho, and LeJEAN NICHOLS, as administratrix of the Estate of Stacey Camacho, | Civil Action File No.:      1:11-CV-03111-AT |
| Plaintiffs, | |
| v. | |
| NATIONWIDE MUTUAL INSURANCE COMPANY, | |
| Defendant. | |

## CERTIFICATE OF SERVICE

This is to certify that I electronically filed this DEFENDANT NATIONWIDE MUTUAL INSURANCE COMPANY'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

Darrell W. Hinson, Esq.
Swope Rodante, P.A.
1234 E 5th Ave E.
Tampa, FL  33605
Camacho_stacey@swopelaw.com

This 15th day of July, 2013.

> *s/STEPHANIE F. GLICKAUF*
> STEPHANIE F. GLICKAUF
> GA State Bar No.  257540
> sglickauf@gmlj.com
> Goodman McGuffey Lindsey & Johnson, LLP
> 3340 Peachtree Road NE, Suite 2100
> Atlanta, GA 30326-1084
> Phone:  (404) 264-1500
> Fax:    (404) 264-1737