IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JESUS CAMACHO, surviving spouse of   :
Stacey Camacho, and LAJEAN   :
NICHOLS, as Administratrix of the   :
Estate of Stacey Camacho,   :
  :
    Plaintiffs,   :        CIVIL ACTION NO.
  :       1:11-CV-03111-AT
    v.   :
  :
NATIONWIDE MUTUAL INSURANCE   :
COMPANY,   :
  :
    Defendant.   :

## ORDER

This case arises out of a 2005 automobile accident that occurred when Nationwide's insured, Seung Park, ran a red light and struck a car driven by Stacey Camacho, causing her death.   After the accident, Nationwide had the opportunity to settle the wrongful death and estate claims of Stacey's surviving family members for Park's $100,000 policy limits, in exchange for a limited liability release that would have released Park from all personal liability from any and all claims arising out of the accident except to the extent other insurance coverage was available from which the Camacho family could seek additional funds.   Nationwide rejected the settlement offer, albeit in an untimely response, and instead insisted on a full general release with an indemnification provision that would have required Jesus Camacho and LaJean Nichols to repay Nationwide in the event other claims were made or payments sought related to

medical liens.  When no settlement was reached, Jesus Camacho and LaJean Nichols filed a wrongful death suit against Park in state court.  On October 19, 2009, the state court jury awarded them $5.83 million.

Following the jury's verdict in the state court wrongful death suit, Park assigned his right to bring a claim for negligent and bad faith failure to settle against Nationwide to Plaintiffs Jesus Camacho and LaJean Nichols.  Plaintiffs filed suit against Nationwide in this court on September 14, 2011, alleging that Nationwide acted negligently and in bad faith in failing to accept their demand for settlement of all claims against its insured within the policy limits and exposing Park to a $5.83 million excess jury verdict. This case was tried before a jury from August 31, 2015 to September 8, 2015.  On September 8, 2015, the jury returned a verdict in favor of Plaintiffs finding that Nationwide "acted negligently or in bad faith in failing to settle the claims made by the Plaintiffs against Nationwide's insured, Seung Park."  (Doc. 168.)  The Parties had agreed that the jury would determine liability only and the Court would determine the amount of the verdict as a matter of law, including attorney's fees.

Plaintiffs' Motion for Entry of Judgment, Notice of Rejected Offer of Judgment Under O.C.G.A. § 9-11-68, and Request for Attorney's Fees [Doc. 178] and Defendant Nationwide's Motion for Judgment Notwithstanding the Verdict [Doc. 182] are now pending before the Court.

## I.   NATIONWIDE'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT [DOC. 182]

### A.   STANDARD OF REVIEW

Under Fed. R. Civ. P. 50, "[a] party's motion for judgment as a matter of law can be granted at the close of evidence or, if timely renewed, after the jury has returned its verdict, as long as 'there is no legally sufficient evidentiary basis for a reasonable jury to find'" for the non-moving party.  *Chaney v. City of Orlando, Fla.*, 483 F.3d 1221, 1227 (11th Cir. 2007); *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001).  "Regardless of timing, however, in deciding on a Rule 50 motion a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence."  *Chaney*, 483 F.3d at 1227.  Thus, in ruling on Nationwide's renewed motion under Rule 50(b) after the jury has rendered a verdict, this Court's sole consideration is to assess whether the jury's verdict is supported by sufficient evidence. *Id.*; *see also Lipphardt*, 267 F.3d at 1186.  In assessing a motion under Rule 50, the Court must review the evidence adduced at trial in the light most favorable to the non-movant.  *Chaney*, 483 F.3d at 1222-23.

### B.   DISCUSSION

Nationwide argues that the evidence does not support a finding of bad faith.  Instead, Nationwide asserts that it cannot be held liable for bad faith failure to settle because (1) Nationwide acted as any reasonably prudent insurer would in responding to Plaintiffs' settlement demand, and (2) Nationwide gave greater consideration to Mr. Park's financial interests than its own.

### 1. Whether Nationwide Acted as a Reasonably Prudent Insurer By Not Accepting Plaintiffs' April 18, 2006 Time-Limited Demand

Nationwide asserts that no reasonably prudent insurer would have accepted Charles McAleer's April 18, 2006 settlement demand because (1) it did not clearly offer to resolve the estate claim, and (2) McAleer did not have the apparent authority to settle the claim on behalf of the estate.

Nationwide's first argument is in some respects a repackaging of its argument on summary judgment that the settlement offer was incapable of acceptance. The evidence presented during the course of the trial did not materially alter the factual and legal posture of the case discussed in the Court's order on Nationwide's motion for summary judgment. (Trial Transcript Doc. 190 at p. 1103.) The Court ruled at the summary judgment stage (Doc. 105 at 19-26), and as to Plaintiffs' motion for judgment as a matter of law at trial, that the offer was capable of acceptance as a matter of law based on the evidence presented. (*Id.* at 1102-03.)

Nationwide also reargued this issue in its own motion for judgment as a matter of law raised at the conclusion of the Plaintiffs' case. After taking the motion under advisement until the conclusion of all the evidence, the Court rejected Nationwide's motion and Nationwide has not offered any reason or authority that would compel revisiting that decision. (Trial Transcript Doc. 190 at p. 1103-04.) As noted by the Court at trial, there was additional evidence

provided via Plaintiff's expert, Peter Knowe[1], that insurance companies are accustomed to settling cases with the understanding that the formalities of setting up an estate are in progress or not yet set up.  (Trial Transcript  Doc. 186 at pp. 359-60; Doc. 187 at pp. 578-79, 583.) The proposed settlement agreement provided that it would have to be approved by the probate court for the estate of Stacey Camacho. The identity of the eventual administrator would have made no difference in that regard.  Based on the trial testimony and the claims log, Ms. Wilson and Nationwide clearly understood that Mr. McAleer was representing both Mr. Camacho and Ms. Nichols in connection with both the wrongful death claim and the estate claim. The agreement called for all funds to be held in the attorney's escrow account. Mr. McAleer, as a matter of law, was therefore legally bound not to release the funds except in connection with satisfaction of both the wrongful death and estate claims on behalf of Stacey Camacho.  None of the circumstances of this purported lack of clarity identified by Nationwide now as rendering the settlement offer unreasonable in terms of acceptance have changed since June 9, 2006 when Nationwide belatedly tendered its offer to settle based on the precise same facts and legal posture of the case.

---

[1] Mr. Knowe is a litigation consultant who formerly worked in the insurance industry for nearly 30 years.  For 12 years, Mr. Knowe was employed with Aetna Casualty and Surety as an insurance claims adjuster and senior technical representative assisting with the resolution of complex litigation including bad faith claims and as an auditor of proper claims handling under industry standards.  After that, Mr. Knowe worked for 15 years with Infinity Insurance Group as a manager in Infinity's corporate litigation department for 15 years where he was responsible for the nationwide evaluation of bad faith litigation, served as Infinity's company's 30(b)(6) trial witness, developed and wrote company best practices for claims handling to meet insurance standards, taught claims handling practices to field staff, directed company compliance for claims handling, and developed a library for bad faith, good faith and fair dealing handling of claims, among other duties.  Since 2006, Mr. Knowe has provided expert testimony and evaluation of insurance litigation nationwide for insurance carriers and individuals in both state and federal courts.

Nationwide further argues that a reasonable insurer would not have accepted McAleer's demand because he did not have any apparent authority to settle the claim on behalf of the Estate.  Nationwide has failed to point to any legal authority to support its position that an estate claim cannot be settled unless an administrator has been appointed.   Nor does Nationwide point to any evidence at trial that Wilson or anyone at Nationwide was concerned about an alleged lack of settlement authority by McAleer at the time.[2]   Nationwide's position is belied by Sharon Wilson's handling of the "estate issue." Both before Plaintiffs' demand was made and after it had expired, Wilson made offers to settle the estate claim with knowledge that a formal estate had not yet been set up and no administrator of the estate had yet been appointed.  Indeed, Nationwide's proposed general release form included language reflecting its knowledge that no administrator had been appointed with respect to the estate:

> AUTHORITY: I/we have full authority to execute a binding release of the above-referenced claim.  I/we have not assigned this claim to anyone else.  There is no guardian, trustee, executor, administrator, or other person or entity with power to approve or disprove settlement of the above-referenced claim.

(Def.'s Ex. 6.)

McAleer's authority to settle on behalf of the estate was never raised as an issue during Wilson's handling of the claim.  Although Nationwide argues in its motion that the "purported [attorney-client] contract was signed by Jesus Camacho," no such evidence was admitted at trial.  Instead, the parties agreed to

---

[2] The testimony of Sharon Wilson and her entries into the claims log, make it apparent that this argument is based on an issue fabricated by defense counsel, after the fact, in an attempt to once again attack the reasonableness of the settlement demand.

the following stipulation that was read by the Court to the jury about the Camacho family's hiring of Mr. McAleer:

> Charles McAleer was and is the attorney of Jesus Camacho, the surviving spouse of Stacey Camacho, and LaJean Nichols, the administratrix of the estate of Stacey Camacho.  On February 28th, 2006, Jesus Camacho, individually and on behalf of the estate, hired Mr. McAleer to represent their interests regarding causes of action arising out of Stacey's death. At the meeting on that same date, Mr. Camacho and Mrs. Nichols agreed upon a contingency fee retainer contract with Mr. McAleer.

(Trial Transcript Doc. 188 at p. 650.)

LaJean Nichols, Stacey Camacho's mother who was ultimately appointed as the Administratrix[3] of the estate, testified that at a February 2006 meeting with Sharon Wilson, Wilson presented LaJean and Jesus with a check for $97,000 and a general release.  (Trial Transcript Doc. 186 at p. 297-301.)  Nichols testified that she and Jesus declined to accept Nationwide's offer to settle for less than the policy limits, feeling that "it just didn't seem right," and instead they decided to hire Charles McAleer as their attorney.  (*Id.* at 300-02.)  Nichols testified that they let McAleer deal with Nationwide after they hired him and expected him to take care of the details of the claims handling with Nationwide, and to do whatever he could to protect the family's rights to recover for Stacey's death.  (*Id.* at 300-01.)  As far as negotiating the terms of settlement, Nichols testified that she expected McAleer to look out for their best interests and "knew that if Nationwide met his terms, you know, that would be --- that would be it.

---

[3] Although they originally planned for Jesus to be the administrator of the estate, Nichols testified she and Jesus decided she should become the administrator because Jesus "had been in this country a few years, but his English, he was very uncomfortable with it. And he asked me to kind of take care of everything for him." (Trial Transcript Doc. 186 at p. 316.)

We knew – understood that." (*Id.* at 302.)  Nichols testified that neither she nor Jesus instructed McAleer on how to deal with Nationwide in terms of settlement discussions.  They left it to him to do what was best for the family.  (*Id.* at 307.)

Thus, the evidence at trial clearly established that Charles McAleer was hired to represent the interests of both Jesus Camacho and LaJean Nichols with respect to all claims arising out of the death of Stacey Camacho — including the wrongful death claim and the estate claim — and that McAleer had ***full and actual authority*** to enter into a settlement with Nationwide as to those claims. *See, e.g., Pembroke State Bank v. Warnell*, 471 S.E.2d 187, 189 (Ga. 1996) ("Under Georgia law an attorney of record has apparent authority to enter into an agreement on behalf of his client and the agreement is enforceable against the client by other settling parties. This authority is determined by the contract between the attorney and the client and by instructions given the attorney by the client, and in the absence of express restrictions the authority may be considered plenary by the court and opposing parties. The authority may be considered plenary unless it is limited by the client and that limitation is communicated to opposing parties. Therefore, from the perspective of the opposing party, in the absence of knowledge of express restrictions on an attorney's authority, the opposing party may deal with the attorney as if with the client, and the client will be bound by the acts of his attorney within the scope of his apparent authority. The client's remedy, where there have been restrictions not communicated to the opposing party, is against the attorney who overstepped the bounds of his agency, not against the third party.").

### 2.     Whether Nationwide Acted in Bad Faith by Giving Greater Consideration to Park's Interests

Nationwide asserts that an insurer cannot be liable for bad faith if the insurer gives greater consideration to its insured's interests than its own.  *See S. Gen. Ins. Co. v. Holt*, 416 S.E. 2d 274, 276 (Ga. 1992) ("In deciding whether to settle a claim within the policy limits, the insurance company must give equal consideration to the interests of the insured."); *Baker v. Huff*, 747 S.E. 2d 1, 6 (Ga. Ct. App. 2013) ("An insurer must act reasonably in responding to a settlement offer, bearing in mind that, in deciding whether to settle, the insurer must give the insured's interests in avoiding liability for a judgment in excess of the policy limits the same consideration that it gives its own interests in paying less than the policy limits.").  According to Nationwide, "a reasonable juror could not take the evidence presented at trial and find that Nationwide put its interests ahead of its insured's interest in advocating for a general release."  (Mot., Doc. 182 at 2.)

Putting aside the terms of Nationwide's belated counter-offer and general release, the evidence at trial was sufficient to support a finding by the jury that, in failing to respond *at all* to the Camacho's settlement demand within the 10 day time limit, Nationwide gave no consideration to Mr. Park's financial interests. *See Cotton States Mut. Ins. Co. v. Brightman*, 580 S.E. 2d 519, 521 (Ga. 2003) (reiterating Supreme Court's prior holding in *Holt* that an insurer has a duty to its insured to respond to a plaintiff's deadline to settle a personal injury claim within policy limits when the insurer has knowledge of clear liability and special

damages exceeding the policy limits, and noting that its holding is "consistent with the general rule that the issue of an insurer's bad faith depends on whether the insurance company acted reasonably in responding to a settlement offer"); *Holt*, 16 S.E. 2d at  276 (same).

On April 18, 2006, Charles McAleer served Nationwide with a demand to settle the claims of Jesus Camacho, for the wrongful death of his wife Stacey Camacho, and the Estate of Stacey Camacho for the $100,000 policy limits.  The April 18th letter states that the demand was "open for [Nationwide's] acceptance for ten (10) days," requested that Nationwide "tender any payment within ten (10) days of today's date," and indicated that after that time the offer would be withdrawn.  (Pls.' Ex. 10.)  Thus, according to the letter the demand expired on Friday, April 28, 2006.  Plaintiffs presented evidence at trial that Nationwide's claims adjuster, Sharon Wilson, took no action from the time she received the April 18th time-limited demand on April 20th until May 1st — the date she calendared for her response.[4]  (Trial Transcript Doc. 186 at 235-36, 248-50.)

> Q. In this period of time, ma'am, between April 18th and ten days later on April 28th, you did not attempt to contact Mr. McAleer, did you? In that period of time between April 18th and April 28th, in that ten day period; correct?
> A. No. I had not because I had just spoken with him a few weeks earlier.

---

[4] Although Nationwide has not expressly renewed in its current motion its prior argument that the 10 day time limit was not reasonable, there was sufficient evidence from which the jury could find that 10 days was reasonable under the circumstances because: (1) Mr. McAleer had previously communicated the terms of the offer to Wilson on March 28, 2006, and (2) Wilson had already determined that liability was clear and that damages would exceed the policy.  In fact, Wilson testified that she considered her response letter as "a conversation trying to get the claim resolved. It was confirmation basically of what we talked about earlier, a few weeks earlier."  (Trial Transcript. Doc. 186 at p. 246.)

(*Id.* at 235.)   Wilson testified that she did not call McAleer during the ten day

period to ask for clarification of the demand or for any further information.   (*Id.*

at 235-36.)   Nor did Wilson contact the insured, Mr. Park, or his attorney during

the time limited window to discuss the settlement demand or the protection he

might receive from an excess verdict if the settlement terms, which included a

limited release, were accepted.[5]   (*Id.* at 252-53.)   Instead she waited until May 1st,

the thirteenth day, to follow up with McAleer.[6]   (*Id.* at 236.)   Wilson admitted

that her handling of this time-limited demand was not in line with the insurance

industry custom and practice[7]:

> Q.  the point is [] you didn't do anything at all until May 1st; isn't that
> right?
> A. Yes. I was diaried to take a look at the file on May 1st.
> Q. Is it your custom and practice to answer time-limited demand
> letters on what you believe is the last day in writing after business
> hours at 7:30 or 7:33 p.m.?
> A. Well, this was an unusual demand letter. Again, the offer of -- to
> pay the claim had already been extended on multiple occasions, so
> basically the letter of April the 18th was confirmation of the
> discussion I had with Mr. McAleer a few weeks earlier.
> Q. My question was, is it your custom to respond to time-limited
> demands at 7:30 p.m. on what you are contending is the last day of
> that demand? Yes or no.
> A. No, sir.

(*Id.* at 250.)

---

[5] Wilson testified that she did not have any discussion with Park regarding the settlement offer
until after her May 1st rejection and counteroffer.  (*Id.* at 252-53.)
[6] Wilson testified that she sent the response on May 1, 2006 at 7:33 p.m., after business hours.
(Trial Transcript Doc. 186 at pp. 245-47.)
[7] She also testified that she was trained that "to accept a time-limited demand, you must accept
it within the time limit." (Trial Transcript Doc. 186 at p. 266.)

These facts, coupled with the other evidence presented at trial[8], are sufficient to permit a reasonable jury to find that Nationwide acted in bad faith in responding to Plaintiffs' time-limited demand to settle within the policy limits and unnecessarily subjected its insured to the possibility of an excess verdict. *Brightman*, 580 S.E. 2d at 521 (Ga. 2003); *Holt*, 416 S.E. 2d at 276 (holding that "[a]n insurance company does not act in bad faith solely because it fails to accept a settlement offer within the deadline set by the injured person's attorney," but that a jury question on the reasonableness of the insurer's actions arose when an insurance company failed to "respond to a deadline to settle a claim within policy limits *when the company* [*had*] *knowledge of clear liability and special damages exceeding the policy limits.*").

Nationwide did not dispute, and the evidence at trial demonstrated, that Nationwide had knowledge of "clear liability and special damages exceeding the policy limits" when Plaintiffs' made their time-limited settlement demand. *See id.* If Nationwide "had tendered its policy limits while the plaintiff's offer was pending, it would have done everything within its control to accept the plaintiff's offer and thus protect its policyholder from an excess verdict. In that situation,

---

[8] Without going into all the evidence at trial, the Court notes there was certain evidence from which the jury could infer that Plaintiffs were being jacked around in their settlement negotiations giving Nationwide's conduct the flavor of bad faith. For example, as noted above, prior to Mr. McAleer's involvement, Plaintiffs testified that Sharon Wilson attempted to settle the wrongful death and estate claims for less than the $100,000 policy limits despite her determination that Park's liability was clear and that the damages far exceeded the value of the policy. Wilson's claims log also reflects that she requested authority to settle under a limited release but that Nationwide was requesting a general release. (Trial Transcript Doc. 186 at pp. 185, 232-33.) When questioned about her request for authority to settle under a limited release, Wilson stated that must have been a typo and that the log entry should have read general release, though she never made any attempt to correct this alleged error in the log. (*Id.* at 185-86.) Wilson also testified that the requirement of a general release was a directive from her superiors. (*Id.* at 266.)

the insurance company would have given equal consideration to its insured's financial interests and fulfilled its duty to [him]." *See Brightman*, 580 S.E.2d at 522. While Nationwide offered to settle on its own terms both before and after Plaintiffs' April 18th time-limited offer was open, Wilson's testimony demonstrates that Nationwide made no such settlement efforts during Plaintiffs' 10 day window.

As this Court previously held on summary judgment, under the circumstances of this case, where Nationwide did not attempt to communicate with its insured regarding the terms of a limited liability release until after Nationwide's May 1st rejection, it was for the jury to decide whether Nationwide's continued insistence on a general release in response to Plaintiffs' time-limited demand was reasonable and in Mr. Park's best interests. The evidence at trial would permit a reasonable jury to find that waiting until after the 10 day policy-limits demand expired to begin inquiries regarding a limited liability release, which Nationwide's insured ultimately later agreed to accept, was in bad faith. *State Farm Mut. Auto. Ins. Co. v. Smoot*, 381 F.2d 331, 333, 340–41 (5th Cir. 1967) (noting that it was "[o]f great significance that the insured was not informed of settlement offers and refusals"); *S. Gen. Ins. Co. v. Holt*, 409 S.E.2d 852, 856 (Ga. Ct. App. 1991) *rev'd in part on other grouds*, 416 S.E.2d 274 (Ga. 1992) and *vacated*, 421 S.E.2d 346 (Ga. Ct. App. 1992) (finding persuasive case law indicating that insurer's failure to inform insured of a settlement offer as demonstrating bad faith or negligence in the refusal to settle a claim within policy limits). In any case, "[t]he jury generally must decide whether the insurer, in view

of the existing circumstances, has accorded the insured 'the same faithful consideration it gives its own interest.'" *Holt*, 416 S.E.2d at 276 (quoting *Great Am. Ins. Co. v. Exum*, 181 S.E.2d 704 (Ga. Ct. App. 1971)).

Turning back to Nationwide's central argument on the "equal consideration" issue, Nationwide contends it received no benefit in negotiating for a general release over a limited liability release, and thus no reasonable juror could find that Nationwide put its interests ahead of Park's interests. "The jury generally must decide whether the insurer, in view of the existing circumstances, has accorded the insured 'the same faithful consideration it gives its own interest.'" *Holt*, 416 S.E.2d at 276 (citing *Great American Insurance Co. v. Exum*, 181 S.E.2d 704 (Ga. Ct. App. 1971); *U.S. Fidelity & Guaranty Co. v. Evans*, 156 S.E.2d 809 (Ga. Ct. App. 1967), *aff'd*, 158 S.E.2d 243 (Ga. 1967)). According to Nationwide, the evidence at trial showed that a general release was more protective of Park than the limited liability release proposed by Plaintiffs and that Park, not Nationwide, had the most to gain from a general release. The Supreme Court of Georgia has held that an insurance company's conditioning its acceptance of a settlement offer on the claimant signing a full release of its insured with indemnification language and requiring the claimant to forfeit access to other potential sources of insurance are considerations for a jury in a subsequent bad-faith claim in determining whether the insurer "acted reasonably" and "like the ordinarily prudent insurer" in responding to the settlement offer. *Fortner v. Grange Mut. Ins. Co.*, 686 S.E. 2d 93, 95 (Ga. 2009).

Thus, the fact that a full release *may* be more protective of an insured than a limited release, does not insulate an insurer from a bad faith action.

Nationwide sought the broadest most comprehensive protection for Mr. Park in its proposed general release. Plaintiffs did not dispute that the general release would have provided greater protection for Mr. Park than the limited liability release they desired. However, Plaintiffs presented evidence that the limited liability release was better than no release, and that in refusing to settle in exchange for a limited liability release, Nationwide left Park completely exposed to the certain financial danger of a verdict in excess of his policy's liability coverage. An insurer may be liable for failing to settle for the policy limits if an ordinarily prudent insurer would consider that choosing to try the case — rather than accept a reasonable offer to settle within the policy limits on the terms by which the claim could be settled — would be taking an unreasonable risk that the insured would be subjected to a judgment in excess of the policy limits. *Brightman*, 580 S.E.2d at 521; *U.S. Fidelity & Guaranty Co. v. Evans*, 156 S.E.2d 809, 811 (Ga. Ct. App. 1967). The reason for this rule is that the insurer may not "gamble with" or risk exposing the personal finances of its insured by refusing to settle within the policy limits. *McCall v. Allstate Ins. Co.*, 310 S.E.2d 513, 514-15 (Ga. 1984).

Plaintiff's insurance expert, Peter Knowe, testified that although Nationwide properly sought a general release in its initial settlement attempts, once it received Plaintiffs' demand to settle within the policy limits in exchange for a limited release "Nationwide should have accepted those terms and settled

this claim." (Trial Transcript Doc. 187 at pp. 532-33.)  As Mr. Knowe (and The Rolling Stones[9]) put it: "you can't always get what you want, the general release. Sometimes you get what you need, which is the limited liability release." (Trial Transcript Doc. 187 at p. 533.)  Mr. Knowe testified that "Nationwide wanted a general release. They couldn't get that. But they could get a limited liability release which would fully protect Mr. Park, their insured, [from an excess verdict] and they owed him that duty to settle per the terms of Mr. McAleer's letter." (*Id.* at 580.)  As Mr. Knowe explained to the jury, Mr. McAleer's conditions for settlement within the policy limits "were very reasonable," and in his professional opinion, Nationwide should have accepted McAleer's settlement offer, without insisting on a general release, in order to protect Park's interests as best it could under the circumstances. (*Id.* at 583.)  According to Mr. Knowe, as it turns out, the limited liability release offered all the protection Mr. Park needed to avoid a $5.83 million judgment.

Contrary to Nationwide's revisionist characterization of the evidence at trial, the general release offered greater protection not only to Mr. Park, but also as to Nationwide.  The "General Release" proposed by Nationwide provided:

> I/We Jesus Camacho and as Next of Kin of Stacey Camacho, deceased being of lawful age, for the sole consideration of One Hundred Thousand and 00/100 Dollars ($100,000.00) . . .do hereby release, remise, and forever discharge Seung Chon Park and Chong Park and Nationwide Mutual Insurance Company their successors and assigns, heirs, executors, administrators, insurers, attorneys, and all other persons; firms, and corporations (Releasees), of and

---

[9] "You Can't Always Get What You Want" was written by Mick Jagger and Keith Richards and recorded by the Rolling Stones on their 1969 album *Let It Bleed*.

> from any and all claims, demands, rights, and causes of action or whatsoever kind and nature, arising from, and by reason of any and all known and unknown, foreseen and unforeseen bodily and personal injuries, damage to property, and consequences thereof resulting and to result from a certain accident . . .
>
> LIENS & INDEMNITY: . . . I /we agree to indemnify and hold harmless the Releasees as to any judgment, claim, payment, expense or attorney's fees arising from any and all claims that might be brought on account of any liens, subrogation claims, government benefits, workers compensation benefit of the United States Government or any state or claims for contribution or indemnity brought by or on behalf of any person, firm or corporation whatsoever.

(Def.'s Ex. 6.)  This release language included an indemnification provision that would have required Jesus Camacho to indemnify Nationwide and Park "as to any judgment, claim, payment, expense, or attorney's fees arising from any all claims that might be brought on account of any liens, subrogation claims, . . . or claims for contribution or indemnity brought by or on behalf of any person, firm, or corporation whatsoever." (*Id.*)

Although neither party introduced a limited liability release form at trial, the jury heard testimony (and was instructed in the Court's charge) regarding the relevant statutory limited liability release provisions in O.C.G.A. § 33-24-41.1:

> (a) In any instance where a claim arising out of a motor vehicle accident is covered by two or more insurance carriers, one such carrier may tender, and the claimant may accept, the limits of such policy; and, in the event of multiple claimants, the settling carrier may tender, and the claimants may accept, the limits of the policy pursuant to a written agreement between or among the claimants. Such claimant or claimants may execute a limited release applicable to the settling carrier and its insured based on injuries to such claimants including, without limitation, claims for loss of consortium or loss of services asserted by any person.

17

(b) The limited release provided for in subsection (a) of this Code section shall:

(1) Release the settling carrier from all liability from any claims of the claimant or claimants based on injuries to such claimant or claimants; and

(2) Release the insured tort-feasor covered by the policy of the settling carrier from all personal liability from any and all claims arising from the occurrence on which the claim is based except to the extent other insurance coverage is available which covers such claim or claims.

Thus, while the statutory limited release would release Nationwide from all liability from any of Plaintiffs' claims based on Stacey Camacho's injuries, it would not require Plaintiffs to indemnify (or reimburse) Nationwide from claims brought by third parties for contribution.

Nationwide asserts that "any benefit Nationwide received from a general release over a limited liability release was 'de minimis,'" pointing to the testimony of Plaintiff's expert, Mr. Knowe.  (Doc. 182 at 3.)  However, Mr. Knowe also testified that:

I looked at the Nationwide release, and it's a fairly comprehensive release. What it does, it slams the door. You can't get any more money from anybody else. In fact, ***they have indemnity and hold harmless language in there that says the Camacho family***, if there's somebody who hasn't been paid or some lien or something that happens as a result of this, ***you have to pay Nationwide*** and hold us harmless and pay for whatever may come of that. So, they have that language in there. But, basically, it shuts the door and the Camacho family can't use Mr. Park to collect any more money for any other policies. Remember, this is an excess situation, where the value of the insurance policy doesn't fairly compensate them for the unfortunate wrongful death of Stacey. There -- this claim hasn't been fully paid, so if there's any more money out there, a general -- a full general release slams the door, they can't collect another penny from anybody.

(Trial Transcript Doc. 186 at pp. 338-340.)  He also explained to the jury in lay terms the purpose of the indemnity and hold harmless clause in Nationwide's release and how Nationwide stood to benefit from the general release:

> If you look at the standard release that Nationwide was requesting the Camacho family to execute, I have a copy here in the claim file notes, it shows that they have an indemnity and hold harmless clause that you promise to make us whole. If anybody in the whole world comes after us for unpaid medical bills or liens or anything else, you hold us harmless. You have to reimburse Nationwide.
>
> . . .
>
> Q. Did Nationwide have anything -- financially anything to gain by insisting on a general release instead of accepting the limited liability release on time?
> A. They could have limited their future attorney's fees for defending Mr. Park in any subsequent lawsuit and save that attorney's fees. And with the general release they had, it would have been a general indemnity and hold harmless agreement that if anybody comes after them for anything, that the Camacho family would have to pay for it.

(Trial Transcript Doc. 186 at p. 359; Doc. 187 at 434-37.)

On cross-examination Mr. Knowe testified that the indemnity was not solely for the benefit of the insured, Mr. Park, but was also for Nationwide's protection to the extent it had any financial exposure.  (Trial Transcript Doc. 187 at p. 527.)  Specifically, with respect to any future claim brought under the dram shop act, Mr. Knowe testified:

> Q. So, my hypothetical here was if -- I'll make it easy. If just Mr. Camacho files suit against the dram shop or under the dram shop against the neighbor, and that person then files a contribution or indemnity claim against Mr. Park, then as an insurance professional, this language potentially provides protection to Mr. Park and to Nationwide?
> A. And to Nationwide to be able to seek recovery for monies that they have to spend defending that.

(*Id.* at 531.)   He confirmed that the indemnity provision in the general release "would reduce their potential exposure for future attorney's fees [and] limit the potential cost of that defense," although he agreed that the potential benefit to Nationwide in this regard might be "de minimis."   (*Id.* at 576-78.)   The jury also heard testimony from Nationwide's corporate representative, Geza Farkas, that its defense costs can be expensive:

> Q. And defense costs can be tens of thousands of dollars sometimes; right, in defending a case?
> A. They could be.
> Q. Could be over a hundred thousand dollars in defending a case?
> A. They are whatever they are.
> Q. They are whatever they are. Sometimes the defense costs actually exceed the amount of the policy that you pay out; right?
> A. They could.

(Trial Transcript Doc. 188 at p. 255.)

In sum, Mr. Knowe testified that Attorney McAleer expressly indicated in his April 18th demand letter that his client would "execute no indemnity or hold harmless clauses," but Nationwide's May 1st rejection and counteroffer included a release with an indemnity provision.   In Knowe's opinion, this was evidence that Nationwide was putting its financial interests ahead of its insured in refusing to accept the Plaintiffs' time-limited demand.   (Trial Transcript Doc. 187 at pp. 438-439.)   He made clear that Nationwide had a duty to its insured to timely accept McAleer's reasonable offer consistent with insurance industry standards to protect its insured then and there from excess verdict exposure.   Thus, there was sufficient evidence presented at trial from which a reasonable jury could find that Nationwide, in pushing for a general release and shirking its duty to respond to

Plaintiffs' demand to settle within the policy limits, exposed its insured to a $5.83 million judgment in excess of its $100,000 policy limits with no release protection of any kind. Though in an ideal world Park (and Nationwide) would be shielded by a general release, the greater coverage provided by the general release was only theoretical if Park was not straight away protected from a multi-million dollar excess verdict which could only be accomplished by timely settlement. And where there is evidence to support the jury's verdict, Nationwide's motion for judgment notwithstanding the verdict must be denied. *See Binns v. MARTA*, 301 S.E.2d 877, 878 (Ga. 1983) ("The question of the insurer's good faith (or lack thereof) is one of fact for the jury, and the jury's determination on this issue should be upheld if there is any evidence to support it."); *Alexander Underwriters Gen. Agency, Inc. v. Lovett*, 357 S.E.2d 258, 263 (Ga. Ct. App. 1987) (same).

### 3. Whether Plaintiffs Established that Nationwide's Failure to Settle Was the Proximate Cause of the Excess Verdict Entered Against Park

Nationwide seeks judgment notwithstanding the verdict under Fed R. Civ. P. 50(b) on the basis that Plaintiffs failed to establish at trial that Nationwide's failure to settle was the proximate cause of the underlying excess verdict. Plaintiffs are correct that Nationwide's motion is improper and untimely because Nationwide did not move for judgment as a matter of law on this proximate cause issue during trial.[10] Nor did Nationwide seek a jury instruction on proximate

---

[10] Although the cases cited by Plaintiffs indicate that the failure to assert a Rule 50(a) motion after the close of all the evidence, Nationwide has waived its challenge on this ground. Rule

cause.  Nationwide relies, instead on a Pretrial Memorandum filed a week before trial began, in which Nationwide advocated for, among other things, its position that "[i]f, Plaintiffs contend, its bad faith claim is a tort, then Plaintiffs bear the burden of proving duty, breach of duty, proximate cause, and damages" and that "Plaintiffs bear the burden of proving in this trial what additional damages, if any, were proximately caused by Nationwide's alleged bad faith refusal to settle." (Doc. 140.)  Because Nationwide has consistently contested the framing of Plaintiffs' claim as tort claim, whether under a negligence or bad faith standard, rather than as a contract based claim, the Court will address Nationwide's arguments.

Nationwide asserts that Plaintiffs must prove that the case would have settled (and the excess verdict would have been avoided) if Nationwide had responded within 10 days and accepted the terms of the April 18th demand. According to Nationwide, even assuming it had accepted the terms of McAleer's demand, Plaintiffs would have had to present testimony that the additional conditions (appointment of an administrator, approval of settlement by the probate court, and approval of release language by McAleer) would have been satisfied.  Of course Nationwide has not presented any legal authority in support of its position, because this is not the law in Georgia with respect to bad faith claims based on the failure to settle within policy limits.

---

50(b) was amended in 2006, however, to permit renewal of any Rule 50(a) motion for judgment as a matter of law made during the course of a trial, deleting the requirement that a motion be made at the close of all the evidence.

Under Georgia law an "'excess liability action . . . is premised on the possibility of settlement,'" and therefore Plaintiffs must "[a]t a minimum, . . . show that settlement was possible." *Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1550 (11th Cir. 1991) (quoting *Gingold,* 288 S.E.2d at 558). "The best evidence that the case could have been settled, of course, is the existence of an offer within the policy limits . . . We assume, however, that if the insured alleges facts showing that the insurer knew, or reasonably should have known, that the case could have been settled within the policy limits—i.e., if the insurer had offered the policy limits, the injured party would have accepted—and the insurer failed to effect a settlement within a reasonable time, the insured states a cause of action for tortious failure to settle." *Id.* at 1550-51. Plaintiffs presented evidence that Nationwide admitted that the settlement was capable of acceptance. (*See* Trial Transcript Doc. 190 at p. 1119 (Nationwide admitted Plaintiffs' allegation in the Complaint that the April 18, 2006 letter contained an offer to settle all claims against Park arising from the death of Stacey Camacho with a limited liability release under O.C.G.A. 33-24-41.1 in exchange for payment of the $100,000 policy limits, subject to other conditions, including acceptance of the offer by delivery of payment within ten days.)). The jury was instructed that a settlement offer, if accepted, forms a legally enforceable contract. (Doc. 167 at p. 11.) Thus, as Plaintiffs correctly point out, if Nationwide had accepted Mr. McAleer's April 18th demand, a legally enforceable settlement agreement would have existed. Most importantly, LaJean Nichols testified that if

Nationwide had met McAleer's terms, the case would have settled.   (Trial Transcript Doc. 186 at p. 302.)

The Court is unconvinced by Nationwide's argument that the existence of certain settlement contingencies preclude judgment in Plaintiffs' favor.   The Georgia Supreme Court has recognized certain safe harbors apply to settlement offers that require a condition beyond an insurer's control to occur.   *Cotton States Mut. Ins. Co. v. Brightman*, 580 S.E.2d 519, 520-22 (Ga. 2003).   The *Brightman* Court held that in such a situation, "[an] insurer[] can create a safe harbor from liability for an insured's bad faith claim under *Holt* by meeting the portion of the demand over which it has control, thus doing what it can to effectuate the settlement of the claims against its insured." *Id.* at 522.   In such a situation, even if settlement does not occur, the insurer is protected from liability under *Holt* for any excess judgment.   *Id.*   As this Court previously found on summary judgment, while an administrator's appointment was beyond the parties' control, Nationwide nevertheless could have "tendered its policy limits while the plaintiff's offer was pending, it would have done everything within its control to accept the plaintiff's offer and thus protect its policyholder from an excess verdict." *See Brightman*, 580 S.E.2d at 522.   While an insured, in order to recover for an insurer's negligent or bad faith failure to settle, "must show that he has suffered actual injury proximately caused by the insurer's failure to settle the suit within a reasonable time after settlement was possible," the courts have held that "[t]he most telling evidence of foreseeable damage, of course, will almost

always be the entry of a judgment in excess of the policy limits." *Delancy*, 947 F.2d at 1552.

Accordingly, McAleer's April 18 policy-limits demand, which included a release expressly authorized under Georgia law, was a legally acceptable offer, susceptible to Nationwide's prompt response, and settlement was possible. Because Nationwide could have "[met] the portion of the demand over which it ha[d] control, thus doing what it [could] to effectuate the settlement of the claims against its insured," *Brightman*, 580 S.E.2d at 522, the Court finds the evidence at trial was sufficient for a jury to determine that Nationwide's failure to settle exposed its insured to a $5.83 million excess verdict and therefore was the proximate cause for these damages.  Nationwide's Motion for Judgment Notwithstanding the Verdict [Doc. 182] is therefore **DENIED**.

## II.   PLAINTIFFS' MOTION FOR ENTRY OF JUDGMENT [DOC. 178]

Consistent with the Court's determination at trial and the agreement of the parties, Plaintiffs seek entry of judgment as a matter of law on the jury's verdict finding that Nationwide acted negligently or in bad faith in failing to settle the claims made by the Plaintiffs against Nationwide's insured, Seung Park. Plaintiffs seek a judgment for damages in the following amounts:[11]

---

[11] In their original Motion for Entry of Judgment, Plaintiffs sought as damages (a) the entire principal amount of the underlying judgment of $5,830,000, (b) $2,146,302 in post-judgment interest through the date of the bad faith jury verdict in this action on September 8, 2015, (c) $998.28 per day in additional interest for each day between September 8, 2915 and the date the Court enters final judgment, and (d) a setoff of $100,000 for Nationwide's partial satisfaction of the judgment applied only to accrued interest and not as a setoff from the principal.  In their subsequent supplemental brief, Plaintiffs modified their request to seek the remaining principal of the underlying excess verdict of $5,730,000 (the amount by which the judgment exceeded the

| | |
|---|---|
| Remaining principal of underlying excess judgment ($5,830,000 - $100,000), plus | $5,730,000 |
| Post-judgment interest from October 19, 2009 to September 8, 2015, plus | $2,146,302 |
| Additional daily interest after September 8, 2015, until paid | $998/day |

Nationwide opposes Plaintiffs' "proposed damage calculation" on several grounds.

### A. Whether Plaintiffs Are Entitled to Judgment as a Matter of Law in the Principal Amount of the Underlying Excess Verdict

First, "Nationwide seeks to reverse or modify the princip[le] [of Georgia law] that an insurer's negligent or bad faith failure to settle renders it liable for the excess verdict as a matter of law. Alternatively Nationwide seeks a ruling that only bad faith – as distinguished from negligence – can support an award in the amount of the excess verdict." (Def.'s Resp., Doc. 180 at 2-3.)

Even if it were persuaded by Nationwide's arguments, this Court is powerless to reverse Georgia law on negligent/bad faith actions. "Federal diversity jurisdiction provides an alternative forum for the adjudication of state-created rights, but it does not carry with it generation of rules of substantive law . . . Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1983); *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 426-27 (1996) ("Under the *Erie* doctrine, federal courts sitting in

___

policy coverage of $100,000), and post-judgment interest on the entire amount of the judgment of $5,830,000.

diversity apply state substantive law").  In determining the law of Georgia, this Court "must follow the decisions of the state's highest court, and in the absence of such decisions on an issue, must adhere to the decisions of the state's intermediate appellate courts unless there is some persuasive indication that the state's highest court would decide the issue otherwise."  *Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 945 (11th Cir. 1982); 28 U.S.C. § 1652.

Despite whatever confusion once existed in Georgia law, Georgia's Supreme Court has held that "[a]n insurance company may be liable for damages to its insured for failing to settle the claim of an injured person where the insurer is guilty of *negligence, fraud, or bad faith* in failing to compromise the claim." *Holt*, 416 S.E.2d at 276 (affirming jury's verdict in favor of assignee for insurer's bad faith failure to settle comprised of full value of excess-verdict in underlying personal injury action) (emphasis added); *McCall v. Allstate Ins. Co.*, 310 S.E.2d 513, 514 (Ga. 1984).  And it is well established that "after an insurer's liability for wrongful refusal to settle a claim against its insured is established, the insured or its assignee is entitled as a matter of law to recover damages equal to the amount by which the judgment exceeds policy coverage."  *Cotton States Mut. Ins. Co. v. Brightman*, 568 S.E.2d 498, 502 (Ga. Ct. App. 2002), *aff'd*, 580 S.E.2d 519 (Ga. 2003); *McCall*, 310 S.E.2d at 514-15 ("Hence, where a person injured by the insured offers to settle for a sum within the policy limits, and the insurer refuses the offer of settlement, the insurer may be liable to the insured to pay the verdict rendered against the insured even though the verdict exceeds the policy limit of liability. The reason for this rule is that the insurer 'may not gamble' with the

funds of its insured by refusing to settle within the policy limits."); *Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1547 (11th Cir. 1991) ("Georgia law is clear that in a case in which a liability insurer defending a claim brought against its insured refuses, in bad faith, an offer to settle within the policy limits, and an excess judgment is entered against the insured, the insured may recover the amount by which the judgment exceeds the policy limits.");*cf. Trinity Outdoor, LLC v. Central Mut. Ins. Co.*, 679 S.E. 2d 10 13 (Ga. 2009) (holding that insured cannot bring an action against its insurer for bad faith failure to settle a claim in the absence of an excess verdict).  To Nationwide's predictable chagrin, it is not this Court's prerogative to announce a new legal standard.

### B.    Whether an Insurer's Failure to Settle is the Proximate Cause of an Excess Verdict as a Matter of Law

Second, Nationwide admittedly "seeks to establish new law that an insurer's failure to settle does not render it liable for an excess verdict as a matter of law due to lack of proximate cause."   (Def.'s Resp., Doc. 180 at 2, n.1.)  Nationwide's refrain is off-key.  It is already well established law in Georgia that an insurance company is not liable for bad faith "solely because it fails to accept a settlement offer within the deadline set by the injured person's attorney.[12]"  *Holt*, 416 S.E.2d at 276.  Neither this Court's rulings prior to and during trial, nor the jury's liability determination support a contrary proposition.  "Rather, the issue is whether all the facts show sufficient evidence to withstand an insurance

---

[12] As explained exhaustively above, under Georgia law an insurance company owes a duty to its insured to "*respond to* a deadline to settle a claim within policy limits when the company has knowledge of clear liability and special damages exceeding the policy limits."  *Holt*, 416 S.E.2d at 276 (emphasis added).

company's motion for directed verdict and permit a jury to determine whether the insurer acted unreasonably in declining to accept a time-limited settlement offer." *Id.* And, questions regarding whether an insurance company acted unreasonably or in bad faith in response to a policy-limits settlement demand and whether that conduct was the proximate cause of a verdict against the insured in excess of his policy-limits are matters for a jury. *See Cotton States Mut. Ins. Co. v. Brightman*, 568 S.E.2d 498, 501 (Ga. Ct. App. 2002), *aff'd*, 580 S.E.2d 519 (Ga. 2003) ("Ultimately, this case is governed by the rule that questions of negligence and proximate cause are, except in plain, palpable, and indisputable cases, for the jury."); *Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1547 (11th Cir. 1991) (noting that "the vast majority of cases in which the Georgia courts have imposed liability for an insurer's failure to settle have undoubtedly involved the insurer's bad faith refusal of an offer within limits that resulted in an excess judgment against the insured"). As previously stated, this Court is in no position to plow new ground as to these established principles of Georgia law.

### C.   Whether an Award of $5.73 Million is an Unconstitutional Penalty

Nationwide argues that a judgment requiring Nationwide to pay the underlying $5.73 million excess jury verdict would be unconstitutional based on a theory that such a judgment would constitute a penalty. (*See* Resp., Doc. 180 at 8-10) (citing *inter alia* B*MW of North America v. Gore*, 517 U.S. 559, 562 (1996) (discussing the Fourteenth Amendment's Due Process Clause prohibition against

the imposition of a "grossly excessive" punishment in the form of a punitive damage award).  According to Nationwide, because Nationwide's alleged failure to settle was not the legal cause of the excess verdict, an award of $5.73 million against Nationwide must be viewed as punitive.  The Court has, however, already addressed both the legal authority on proximate cause and the sufficiency of the evidence at trial as to the causal connection between Nationwide's actions and the underlying jury verdict against its insured after the case failed to settle for the policy limits.

Nationwide's reliance on cases involving the constitutionality of punitive damage awards compared to compensatory damage awards is misplaced.[13] Georgia law on the common law tort of bad faith failure to settle provides that "the insured or its assignee is entitled as a matter of law to recover damages equal to the amount by which the judgment exceeds policy coverage," and characterizes such damages as compensatory and liquidated.  *Brightman*, 568 S.E.2d at 502 ("Where, as here, these are the only damages sought, damages are liquidated . . . Where the amount of damages recoverable appears from the undisputed evidence to be certain, it is proper for the court to direct the verdict.") (internal citations omitted); *Holt*, 416 S.E. at 276-77.

"Compensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.'"  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (addressing

---

[13] Because this case involves the common law tort of bad faith failure to settle, Nationwide's reliance on Georgia's statutory penalty provisions for an insurer's bad faith failure to pay the claims of its policy holders is similarly inapplicable.

constitutional reasonableness of $145 million punitive damage award compared to $1 million compensatory damage award in in action against insurance company for bad faith failure to settle wrongful death suit resulting in verdict in excess of policy).  In Georgia, "[e]xposure of the insured's assets to potential liability constitutes the element of damages" in an action against the insurer for its negligent or bad faith failure to settle a claim within the policy limits. *Brightman*, 568 S.E.2d at 501; *see also Cotton States Mut. Ins. Co. v. Brightman*, 580 S.E.2d 519, 522 (Ga. 2003) (affirming $2.1 million judgment in action for bad faith or negligent refusal to settle underlying personal injury action in policy limits and holding that "[t]his rule is intended to protect the financial interests of policyholders in cases where continued litigation would expose them to a judgment exceeding their policy limits while protecting insurers from bad faith claims when there are conditions involved in the settlement demand over which they have no control.")

Indeed, in addition to compensatory damages in the amount of an excess verdict, insureds (as opposed to their assignees) may also seek punitive damages against their insurers for the bad faith failure to settle.  *See id.*; *see also Holt*, 416 S.E. at 276-77; *Dickerson v. Am. Nat. Prop. & Cas. Co.*, No. 3:07-CV-111(CDL), 2009 WL 1035131, at *9 (M.D. Ga. Apr. 16, 2009) (Land, J.) (denying insurer's motion for summary judgment on punitive damages claim and finding that a reasonable factfinder could conclude that insurance company's claims representative "acted with conscious indifference to the consequences of failing to accept Bowen's demand/offer in a timely fashion" where the evidence viewed

in the light most favorable to the plaintiff indicated that claims representative had knowledge of clear liability and damages exceeding the policy limit, but did not accept the plaintiff's "demand/offer within the deadline, did not seek an extension of the deadline, and did not consult anyone regarding any questions he had about the legal consequences of accepting the demand/offer"). Thus, the Court is unconvinced by Nationwide's argument that a bad faith judgment comprised of a multi-million dollar excess verdict is punitive rather than compensatory.

Because the underlying excess verdict constitutes the measure of compensatory damages for Plaintiffs' claim here as a matter of law, the Court rejects Nationwide's arguments that a judgment based on the $5.73 million excess verdict is an unconstitutional penalty in violation of the Fourteenth Amendment's Due Process Clause.

### D. Whether Plaintiffs Are Entitled to Accrued Post Judgment Interest of More Than $2 Million as an Element of Damages in Their Bad Faith Action Against Nationwide

While it is clear under Georgia law that Plaintiffs' damages include the underlying $5.83 million judgment minus Nationwide's $100,000 policy limits,[14] it is not quite as clear whether Plaintiffs' damages also include interest on that judgment of more than $2 million. Neither the Georgia Supreme Court nor the Georgia Court of Appeals has directly spoken on the precise issue of the inclusion of post-judgment interest in a damage award in the context of a subsequent tort

---

[14] *Brightman*, 568 S.E.2d at 502 (finding no error in trial court's determination as a matter of law that the plaintiff's "damages are the difference between the $1,787,500 judgment obtained by Brightman against Martin and the combined $400,000 limits of the insurance policy").

action against an insurer for failure to settle a claim against its insured that ultimately results in an excess verdict.[15]

Nationwide opposes the inclusion of interest as part of Plaintiffs' damages on the bad faith claim for a number of reasons: (1) "it is not clear that Georgia law allows a party to recover interest on an underlying judgment as part of a judgment against a different tortfeasor;" (2) the Georgia Court of Appeals has "impliedly determined that post-judgment interest is not part of a bad faith failure to settle claim;" (3) an award of interest on the underlying verdict would require Nationwide to pay interest on interest, which is prohibited under Georgia law; (4) Plaintiffs are equitably estopped from and/or have waived the right to collect post-judgment interest by virtue of their agreement with Park not to collect on the judgment for five years in exchange for the assignment of Park's bad faith claim; (5) "at the very least," Nationwide only owes post-judgment interest from October 9, 2009 to February 23, 2011, when it paid its $100,000 policy limits in partial satisfaction of the judgment against Park; (6) post-judgment interest is a statutory penalty that cannot be assigned; (7) post-judgment interest is only recoverable against an insurer in contract, not tort, because there is no independent duty in tort law requiring an insurer to pay post-judgment interest on a judgment against its insured, and (8) federal law, not Georgia law, controls the calculation of the amount of interest owed. (Resp., Doc. 180 at 11-13; Supp. Br., Doc. 194 at 5-8.)

---

[15] For this reason and because the parties' original briefing did not adequately address the inclusion of interest on the underlying judgment against Park as part of Plaintiffs' judgment here on their negligent/bad faith failure to settle claim against Nationwide, the Court ordered the parties to provide supplemental briefing with legal authority on the issue.

### 1.    Interest is an element of damages in a bad faith action

In support of their request for over $2 million in accrued post-judgment interest, Plaintiffs rely predominantly on Georgia's post-judgment interest statute, O.C.G.A. § 7-4-12, which provides that "postjudgment interest . . . shall apply automatically to all judgments in this state and the interest shall be collectable as a part of each judgment whether or not the judgment specifically reflects the entitlement to postjudgment interest."  O.C.G.A. § 7-4-12(c).  Under the statute, judgments of Georgia courts "bear annual interest upon the principal amount recovered at a rate equal to the prime rate as published by the Board of Governors of the Federal Reserve System, as published in statistical release H. 15 or any publication that may supersede it, on the day the judgment is entered plus 3 percent."  O.C.G.A. § 7-4-12(a).  Thus, under the clear language of the statute, the Camacho Family's underlying state court judgment[16] against Mr. Park began accruing annual interest on October 19, 2009 at 6.25%.[17]  Post-judgment interest under O.C.G.A. § 7-4-12 is automatically "due from the date the judgment is entered until the date the judgment is paid." *Great Southern Midway v. Hughes*, 478 S.E.2d 400, 401-402 (Ga. Ct. App. 1996) (citing O.C.G.A. § 7-4-12); *see also*

---

[16] Because the underlying action was brought and judgment was entered in the State Court of Fulton County, Georgia, O.C.G.A. § 7-4-12 applies to the judgment rather than 28 U.S.C. § 1961 which applies to "[i]nterest . . . on any money judgment in a civil case recovered in a [federal] district court."  Nationwide's argument that federal law controls the calculation of the amount of interest owed on the underlying judgment in this diversity action conflates the post-judgment interest that automatically accrues on the final judgment to be entered in this bad faith action with the entirely separate award of post-judgment interest that automatically began accruing on the underlying tort judgment on the date judgment was entered by the state court in that case pursuant to OCGA § 7-4-12(c).  *See St. Paul Reinsurance Co., Ltd. v. Ross*, 622 S.E.2d 374, 381 (Ga. Ct. App. 2005)

[17] *See* http://www.federalreserve.gov/releases/h15/20091026/ (indicating prime rate of 3.25% on October 19, 2009).

*Threatt v. Forsyth Cty.*, 585 S.E. 2d 159, 164 (Ga. Ct. App. 2003) (rejecting argument that interest under O.C.G.A. § 7-4-12 was not owed until court ordered it paid because payment of interest is required by under O.C.G.A. § 7-4-12, and no court order is required to make the judgment creditor liable for its payment).

Nationwide raises an interesting argument that Georgia law is unclear on whether a third party may recover interest on an underlying judgment as part of a separate judgment against a different tortfeasor. Nationwide is correct only in the sense that neither the Georgia Supreme Court nor the Georgia Court of Appeals has expressly held that post-judgment interest on an excess judgment is included in the damages awarded in a subsequent action by the judgment creditor as an assignee against an insurance company for its bad faith/negligent failure to settle a claim against the insured.[18] S*ee Colonial Refrigerated Transp.,*

---

[18] Nationwide is incorrect in its assertion that the Georgia Court of Appeals declined to decide whether a claimant is entitled to recover post-judgment interest on an underlying tort judgment against an insurer in a separate garnishment action in *St. Paul Reinsurance Co. v. Ross*. In fact, the Court in *Ross* addressed two separate potential awards of interest and held:

> First, there is the post-judgment interest that automatically accrues on the final judgment entered in the garnishment action up to the point of actual disbursement of the garnished funds . . . Second, there is the entirely separate award of post-judgment interest that automatically began accruing on the underlying tort judgment on the date final judgment was entered in that case pursuant to OCGA § 7-4-12(c), and which a tort judgment creditor may later seek to garnish along with the principal judgment debt owed. *See Great Southern Midway*, 223 Ga.App. at 643-644, 478 S.E.2d 400. Indeed, when a claim for this type of interest arises in a later-filed garnishment action, it is more akin to a request for pre-judgment interest because the judgment creditor seeks to recover interest running from before the trial court enters judgment in the garnishment action and, in fact, from before the garnishment action was even commenced.
>
> However, in the present case, the affidavit of garnishment filed by the Rosses only alleged that St. Paul was indebted to them for the amount of the consent judgment, not for any interest that had and was automatically accruing on that earlier judgment. *Compare Lott v. Arrington & Hollowell, P.C.*, 258 Ga.App. at 52, 572 S.E.2d 664 (affidavit of garnishment filed by judgment creditor explicitly stated that garnishee was indebted to creditor for judgment amount plus accrued interest). "[G]arnishment proceedings are governed by the pleading and practice provisions of the Civil Practice Act. OCGA § 18-4-1." *Horizon Credit Corp. v.*

*Inc. v. Mitchell*, 403 F.2d 541, 552 (5th Cir. 1968) ("In a diversity case, the recovery of interest prior to the date of judgment as an element of damages is a substantive question controlled by state law.")   However, Nationwide mischaracterizes the law cited in support of its proposition that post-judgment interest is not permitted on such claims.   Contrary to Nationwide's suggestion, O.C.G.A. § 7-4-12 does not indicate that post-judgment interest is only collectible as against the defendant whom judgment is entered.   *See* O.C.G.A. § 7-4-12 (providing that that post-judgment interest "shall be collectable as a part of each judgment").   While that may be the typical scenario, nothing in the statute expressly limits the scope of its application in this way or precludes the inclusion of post-judgment interest under the factual circumstances presented in this case.

By virtue of an Assignment Agreement between Nationwide's insured, Seung Park, and Plaintiffs Jesus Camacho and LaJean Nichols, Plaintiffs stand in Mr. Park's shoes after successfully prosecuting Mr. Park's bad faith claim against Nationwide and are entitled to the same damages as Mr. Park would be had he brought the claim himself against Nationwide.   In Georgia, "[e]xposure of the insured's assets to potential liability constitutes the element of damages" in an action against the insurer for its negligent or bad faith failure to settle a claim

---

*Lanier Bank & Trust Co.*, 220 Ga.App. 362, 363(1), 469 S.E.2d 452 (1996). Under the Civil Practice Act, a party's complaint or amendments thereto must put an opponent on notice of the claims and relief sought; otherwise, such claims and relief are waived. *See, e.g., Uniflex Corp. v. Saxon*, 198 Ga.App. 445(2), 402 S.E.2d 67 (1991); *First Bank & Trust Co. v. Ins. Svc. Assn.*, 154 Ga.App. 697, 699(4), 269 S.E.2d 527 (1980). Because the Rosses failed to timely put St. Paul on notice that they were seeking to garnish the interest accruing on the underlying consent judgment, their claim for that interest has been waived. *See* OCGA § 18-4-61 (affidavit of garnishment must set forth "the amount claimed to be due on the judgment").

*St. Paul Reinsurance Co. v. Ross*, 622 S.E.2d 374, 380-81 (Ga. Ct. App. 2005).

within the policy limits and "the insured or its assignee is entitled as a matter of law to recover damages equal to the amount by which the judgment exceeds policy coverage." *Brightman*, 568 S.E.2d at 501-02.   Because the underlying judgment accrued interest, Park's liability to the Camacho Family includes both the principal amount of the judgment and interest under O.C.G.A. § 7-4-12. *Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Schlossberg*, 570 A.2d 328, 337 (Md. App. 1990) (finding that the measure of damages to be awarded are fixed as "the difference between the judgment and policies' limits, plus interest and costs," and the assignment of the cause of action does not affect the extent of the insurer's liability for negligent or bad faith refusal to settle)).   Thus, the damages available to Park in a bad faith action against Nationwide includes the amount of the excess verdict plus post-judgment interest.   And the same goes for Plaintiffs as Mr. Park's assignees.

### 2.   Interest under O.C.G.A. § 7-4-12 is not a penalty and its recovery is assignable

Nationwide asserts that post-judgment interest is a penalty imposed to deter delays in payment of a judgment that is specific or personal to the judgment debtor (Mr. Park), and like punitive damages and statutory penalties cannot be assigned.   Nationwide has failed to cite any direct authority in support of this position, instead relying solely on Georgia's case law holding that "claims for statutory penalties pursuant to O.C.G.A. § 33-4-6 may not be assigned."   *Canal Indem. Co. v. Greene*, 593 S.E.2d 41, 46 (Ga. Ct. App. 2003) (citing *S. Gen. Ins. Co. v. Ross*, 489 S.E.2d 53, 57-58 (Ga. Ct. App. 1997)); O.C.G.A. § 33-4-6

(providing that "in the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer").

Nationwide is correct that one purpose of post-judgment interest is to "deter post-judgment delay and bring finality to judgments," but there is no legal authority that the post-judgment interest provided for in O.C.G.A. § 7-4-12 is a statutory penalty that cannot be assigned along with a tort claim for bad faith. Instead, both Georgia and Federal courts have characterized such interest as part of a judgment creditor's actual or compensatory damages. In *Sec. Life Ins. Co. v. St. Paul Marine & Fire Ins. Co.*, the Georgia Court of Appeals stated:

> Under O.C.G.A. § 7-4-12, interest on a judgment continues to accrue . . . until paid. Such post-judgment interest was a damage that the plaintiffs recovered against Security Life and should be included in calculating the recovery against it . . . because post-judgment interest [] is intended to deter post-judgment delay, motions, and appeals and to bring finality to judgments or the defendant pays the price of protracted post-judgment litigation, as in this case.

588 S.E.2d 319, 323 (Ga. Ct. App. 2003), *aff'd in part, rev'd in part on other grounds by* 606 S.E.2d 855 (Ga. 2004), and *vacated in part sub. nom. by*, 614 S.E.2d 477 (Ga. App. 2005); *Nodvin v. West*, 397 S.E.2d 581, 584 (Ga. Ct. App. 1990) (repeating prior holding of court that under O.C.G.A. § 7-4-12, "post-judgment interest . . . is *inherent in the judgment* whether specifically mentioned

in the judgment of the superior court as all judgments bear interest from date of rendition and it is immaterial that the verdict or judgment does not provide for future interest")(emphasis added); *see also Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36 (1990) ("[T]he purpose of postjudgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant."); *FIGA v. R.V.M.P. Corp.*, 874 F.2d 1528, 1533 (11th Cir. 1989) ("[A] successful claimant is theoretically entitled to receive the compensation on the date of entry of the judgment; in practice, this is not feasible, and post-judgment interest serves to reimburse the claimant for not having received the money in hand on that day. This is effectuated by the federal statute providing interest on all federal court judgments. 28 U.S.C. § 1961.").

Although Georgia courts do not allow an insured to assign a *statutory* claim for bad faith against his insurer for its bad faith failure to pay a covered claim, Georgia courts recognize that O.C.G.A. § 33-4-6 is not the exclusive remedy for bad faith failure to settle claims:

> This court has held that there are also tort claims for bad faith failure to settle. A claim for bad-faith failure to settle sounds in tort and involves, at least in part, a claim that the insurer's conduct exposed the insured's personal property to loss. A claim for 'a tort cause of action for compensatory damages for loss of property resulting from an insurer's bad-faith' may be assigned.

*Canal Indem. Co.*, 593 S.E.2d at 46 (internal quotations omitted) (citing *Thomas v. American Global Ins. Co.*, 493 S.E.2d 12 (Ga. Ct. App. 1997) and *Southern Gen. Ins. Co. v. Holt*, 416 S.E.2d 274 (Ga. 1992)).  Thus, while Georgia courts have

found that a statutory claim for bad faith pursuant to O.C.G.A § 33-4-6 may be made only by the insured, under O.C.G.A. § 44-12-24, "a right of action is assignable if it involves, directly or indirectly, a right of property," and a party may assign a cause of action involving a tortious injury to his property, including a tort claim for bad-faith failure to settle. *S. Gen. Ins. Co. v. Ross*, 489 S.E.2d 53, 57-58 (Ga. Ct. App. 1997) (citing *Jefferson Ins. Co., v. Dunn*, 482 S.E.2d 383 (Ga. Ct. App. 1997) (holding that under O.C.G.A. § 44–12–22 "all choses in action arising upon contract may be assigned so as to vest the title in the assignee . . . and [a]fter a loss, the claim of the insured, like any other chose in action, could be assigned without in any way affecting the insurer's liability"); *see also Empire Fire & Marine Ins. Co. v. Driskell*, 585 S.E.2d 657 (Ga. Ct. App. 2003) (affirming award of post-judgment interest in action brought by accident victim on assignment of insured's claim against insurance company for its breach of duty to defend under insurance policy). Park's entitlement in a tortious bad faith claim against Nationwide to recover damages equal to the amount by which the judgment against him exceeds the limits of his policy is no less a personal right than the incidental right to recover accrued interest on that judgment. And Georgia courts have held that such claims are assignable. Accordingly, the Court finds no merit in Nationwide's argument that post-judgment interest under O.C.G.A. § 7-4-12 is not assignable along with a bad faith failure to settle claim sounding in tort.[19]

---

[19] Nationwide also asserts that if the post-judgment interest claims were assignable, they were not assigned in this case because nothing in the agreement mentions assignment of claims for

### 3.    Interest on the underlying judgment is not limited by the terms of Nationwide's policy

According to Nationwide, any post-judgment interest to which Plaintiffs would be entitled is limited under the terms of Nationwide's policy with Mr. Park. The policy provides that "in addition to" the policy limits for liability for bodily injury, Nationwide "will pay post-judgment interest on all damages awarded," but Nationwide "will not pay interest that accrues after such time as [Nationwide] ha[s]: (1) paid; (2) formally offered; or (3) deposited in court; the amount for which [Nationwide] w[as] liable under this policy."  (Pls.' Ex. 18 at NW001138.) Nationwide first asserts that it owes no interest under the policy because any obligation owed to Park, its insured, to pay post-judgment interest on the underlying judgment extinguished prior to this bad faith lawsuit when Nationwide "tendered" its policy limits on October 14 and 15, 2009, following the jury verdict in the wrongful death action.  In these letters, Nationwide offered to "tender" its "$100,000 liability limits for this loss" and "re-tender[ed] the $100,000 liability limits on behalf of Jacob Camacho's claim in settlement of th[e] matter against [Nationwide's] insured, Mr. Park," but nothing in the correspondence indicates that Nationwide included actual payment by check. Nationwide equates a tender with an *offer* to pay money.  However, under Georgia law, "[i]n order to constitute a proper tender, the tender must be certain

---

post-judgment interest and the sole subject of the assignment is the claim for "failing to settle" the claims of the Camacho Family, which does not include failing to pay the entire judgment against Park.  (Suppl. Br., Doc. 194 at 6.)  However, the right to recover the interest accrued on the underlying judgment is not a separate and independent claim, and as explained more fully in this Order, such interest is inherent in the measure of damages on a claim for bad faith/negligent failure to settle.

and unconditional, and be in full payment of the specific debt. [O.C.G.A. § 13-4-24.]  A written proposal to pay money, with no offer of the cash, is not a tender." *Edward v. BAC Home Loans Servicing, L.P.*, 534 F. App'x 888, 892 (11th Cir. 2013) (citing *Crockett v. Oliver*, 129 S.E.2d 806, 807–08 (Ga. 1963); *Angier v. Equitable Bldg. & Loan Assoc.*, 35 S.E. 64 (Ga. 1900)); *see also Southern General Ins. Co. v. Ross*, 489 S.E. 2d 53, 56 (Ga. Ct. App. 1997) ("A tender conditioned on a release of "all claims," which includes claims not included within the obligation at hand, is not effective.") (citation omitted).

Alternatively, Nationwide asserts that under its policy interest accrued only up to the date Nationwide paid the $100,000 policy limits on behalf of Mr. Park on February 23, 2011 as partial satisfaction of the judgment and its obligation to pay any additional interest under the policy ceased after that date.  (Doc. 178-2, Notice of Partial Satisfaction of Judgment.)  The Georgia Court of Appeals interpreted a similar policy provision[20] in *Southern General Ins. Co. v. Ross*, and held that once the insurer paid its policy limits — the portion of the judgment for which it was responsible under the policy — "its duty to pay interest abated even though it had not paid the interest accrued to that point.[21]" 489 S.E. 2d at 57.  At that point, the insured remains liable for the remaining post-judgment interest

---

[20] In *Southeast Atlantic Cargo Operators, Inc. v. First State Ins. Co.*, the Georgia Court of Appeals referred to this type of provision as a "standard interest clause" and noted that "it is the intent of the 'standard interest clause' that the insurer will pay interest on the entire amount of the judgment until policy limits are paid or tendered or deposited in court."  456 S.E.2d 101, 103-04 (Ga. Ct. App. 1995).

[21] Plaintiffs argue that because Nationwide paid only its policy limits but did not pay any of the post-judgment interest *required under the policy* "Nationwide has not triggered the cessation of the accrual of interest [] under the plain terms of its own policy." (Doc. 195 at 7.)  This argument is meritless in light of the decision in *Southern General Ins. Co. v. Ross*.

until the judgment is paid in full.  *Southeast Atlantic Cargo Operators, Inc. v. First State Ins. Co.*, 456 S.E.2d 101, 103-04 (Ga. Ct. App. 1995).  Thus, to the extent Nationwide's liability for post-judgment interest is determined solely by its policy, Nationwide would only be responsible for post-judgment interest accrued from the date of the underlying judgment on October 19, 2009 through the date it paid its policy limits on February 23, 2011, and Mr. Park would be responsible for payment of the remaining interest.[22]

As Plaintiffs note, though, Nationwide's liability for its bad faith/negligent failure to settle is not controlled solely by Nationwide's insurance policy.  Georgia law is clear that an insured, or his assignee, may sue an insurer in *tort* for extra-contractual damages resulting from the insurer's bad faith/negligent failure to settle a claim against the insured resulting in a judgment in excess of the policy limits:

> The contractual relationship between insurer and insured creates [] an independent duty, implied from the terms of the contract, between insurer and insured: the insurer "owes to the insured a duty independent of the contract not to injure him, and when, from its negligent failure or refusal to adjust a claim, or from fraud or other bad faith, he sustains damages other than damages covered by the insurance contract, then an action in tort would be appropriate." *Leonard v. Firemen's Ins. Co.*, 100 Ga. App. 434, 111 S.E.2d 773, 776 (1959) (emphasis added); *see also Alexander Underwriters Gen. Agency, Inc. v. Lovett*, 182 Ga. App. 769, 357 S.E.2d 258, 262, 265 (1987) (when insurer failed to accept offer of settlement and refused to defend issue of damages after offer was made, suit was "not upon

---

[22] *See Empire Fire & Marine Ins. Co. v. Driskell*, 585 S.E.2d 657 (Ga. Ct. App. 2003) (affirming award of post-judgment interest accruing through the date insurer tendered its policy limits in action brought by accident victim on assignment of insured's claim against insurance company for its breach of duty to defend under insurance policy). The Court notes that *Driskell* involved the assignment of a contractual claim by the insured under the policy and thus does not conflict with the Court's determination herein that post-judgment interest is not controlled by the insurance policy in a bad faith tort action for extra-contractual damages.

the contract of insurance but rather in tort and involved a duty by
the insured [sic] and an alleged breach of that duty"); *Smith*, 339
S.E.2d at 329 (distinguishing contract action for insurer's failure to
defend a suit from "tort case involving a non-contractual duty to
settle"); *Davis v. Cincinnati Ins. Co.*, 160 Ga. App. 813, 288 S.E.2d
233, 237 (1982) (*Davis II*) (distinguishing contract action for
insurer's denial of coverage and failure to defend from tort action for
failure to settle); *United States Fidelity & Guar. Co. v. Evans*, 116
Ga. App. 93, 156 S.E.2d 809, 811 ("the insured's suit is not upon the
contract but rather in tort and naturally involves a duty and an
alleged breach of that duty"), *aff'd*, 223 Ga. 789, 158 S.E.2d 243
(1967); *see generally* 14 G. Couch, R. Anderson & M. Rhodes,
Cyclopedia of Insurance Law, § 51.25 (rev. ed. 1982). Because this
suit is in tort, therefore, the insured may sue the insurer for failure to
settle only when the insurer had a duty to settle the case, breached
that duty, and its breach proximately caused damage to the insured
beyond the damages, if any, contemplated by the insurance contract.

*Delancy v. St. Paul Fire & Marine Ins. Co.,* 947 F.2d 1536, 1545-47 (11th Cir.

1991). Consequently, this claim does not arise out of Nationwide's contractual

duties to Park, including the payment of interest on any judgment entered

against Park. Park's damages arise out of Nationwide's bad faith or negligent

conduct as established by the jury and thus are not limited by the terms of the

insurance policy. As a result of Nationwide's failure to settle the underlying

claim, Mr. Park incurred damages over and above those covered by the policy –

the $5.83 million judgment plus millions of dollars of post-judgment interest that

accrued before and after Nationwide's partial satisfaction of the judgment via the

payment of its $100,000 policy limits. Because Mr. Park is liable to the Camacho

Family for these amounts, and Georgia law provides that the insured in a bad

faith action may recover from his insurer the amount by which the judgment

exceeds the policy limits, Nationwide is liable not only for the excess verdict but

for all automatically accrued post-judgment interest. *See id.*; *Cotton States Mut.*

*Ins. Co. v. Brightman*, 568 S.E.2d 498, 499, 500 (Ga. Ct. App. 2002) (affirming jury verdict "awarding Brightman the principal sum of $1,387,500 [$1,787,500 personal injury judgment minus $400,000 policy limits paid by insurers] plus $743,421.91 interest for a total of $2,130,921.91 against Cotton States"), *aff'd*, 580 S.E.2d 519 (Ga. 2003) (affirming jury verdict for bad faith failure to settle awarding insured's assignee more than $2.1 million including principal amount of $1,387,500 excess verdict and interest, "[b]ecause there was sufficient evidence for the jury to find that Cotton States acted unreasonably in failing to tender its policy limits in response to Brightman's settlement offer"); *S. Gen. Ins. Co. v. Holt*, 416 S.E.2d 274, 275 (Ga. 1992) (affirming verdict of $83,000 in actual/compensatory damages to insured's assignee on claim against Southern General seeking $67,000 plus interest for the insurance company's bad faith failure to settle); *Hulsey v. Travelers Indemnity Co. of America*, 460 F. Supp. 2d 1332, 1337-38 (N.D. Ga. 2006) (denying insurer's motion for partial summary judgment in bad faith action on the issue of post-judgment interest and finding that because Georgia Court of Appeals' decision in *Southern General Insurance Co. v. Ross* did not hold that in a case involving negligent or bad faith refusal to settle, the duty to pay interest abates at the time when an insurer tenders its policy limits, insured was not barred from recovering post-judgment interest incurred in addition to the principal amount of the excess judgment); *see also* New Appleman Ins. Bad Faith Litigation § 9.03 (2nd Edition 2016) ("At the very least, in an action for breach of the insurer's duty to settle, an insured can recover the difference between the total amount of the judgment in the third party suit

and the amount of the policy limits, plus interest and costs.") (citing *inter alia*, *Cotton States Mut. Ins. Co. v. Brightman*, 568 S.E.2d 498 (Ga. Ct. App. 2002), *aff'd*, 580 S.E.2d 519 (Ga. 2003)).

### 4.   Interest is not precluded by the Assignment Agreeement between Plaintiffs and Mr. Park

Nationwide further asserts that Plaintiffs agreed to forego accrual of post-judgment interest from June 2011 to June 2016 via the Assignment Agreement with Mr. Park.  The Assignment Agreement provides, in relevant part, that: (1) Park assigns to the Camacho Family "all of Park's assignable rights and claims against Nationwide . . . for failing to settle the claims" brought by the Camacho Family; (2) the Plaintiffs have the "right to execute on the Final Judgment against Park, using all lawful means to collect from all persons and available sources which hold assets of Park,"  but agree to "temporarily forego such efforts against Park in exchange for an assignment of Park's rights and claims against Nationwide;" and (3) in exchange for the assignment of the claim, the Camacho Family grants Park "a temporary stay of execution on the Final Judgment for a period of five years from the date of [the] agreement," and agrees they "will not pursue collection of the final judgment from any persons or available sources holding assets of Park . . . and will take no steps to enforce the final judgment against the personal assets or future income of Park or his family."  (Def.'s Ex. 26.)   The Assignment Agreement says nothing about the accrual of post-

46

judgment interest or the abatement of such interest during the five year term of the agreement.[23]

Nationwide asserts that because Plaintiffs warranted they would not pursue payment from Park in exchange for an assignment of his bad faith claim, they are equitably estopped and/or have waived the right to collect interest. Nationwide offers no legal authority in support of their estoppel/waiver argument. It is not the Court's job to make Nationwide's arguments and the Court cannot fathom why equitable estoppel principles apply to the circumstances of this case. *See Bailey v. ERG Enterprises, LP*, 705 F.3d 1311, 1320-21 (11th Cir. 2013) ("Equitable estoppel allows a nonsignatory to enforce the provisions of a contract against a signatory in two circumstances: (1) when the signatory to the contract relies on the terms of the contract to assert his or her claims against the nonsignatory and (2) when the signatory raises allegations of interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. [] In essence, equitable estoppel precludes a party from claiming the benefits of some of the provisions of a contract while simultaneously attempting to avoid the burdens that some other provisions of the contract impose. . . .") (citations omitted); *In re Humana Inc. Managed Care Litigation*, 285 F.3d 971, 976 (11th Cir. 2002) (citations omitted) ("In all cases, the lynchpin for equitable estoppel is equity, and the point of applying it to

---

[23] Nationwide's assertions that "Georgia law allows parties to set post-judgment interest by agreement" and that "contracting parties may control or limit the interest flowing from a judgment entered on a contract" are entirely irrelevant. The underlying judgment at issue here was on a personal injury/wrongful death claim and not a contract dispute wherein the terms of post-judgment interest were specified in the contract. And the Assignment Agreement does not purport to limit the amount of post-judgment interest collectable on the underlying judgment.

compel [application of a contractual provision] is to prevent a situation that would fly in the face of fairness. The purpose of the doctrine is to prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from relying on the contract when it works to his advantage by establishing the claim, and repudiating it when it works to his disadvantage. . . . The plaintiff's actual depend[e]nce on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the *sine qua non* of an appropriate situation for applying equitable estoppel."); *Hunnicutt v. S. Farm Bureau Ins. Co.*, 351 S.E.2d 638, 641 (Ga. 1987) ("In order to constitute estoppel by conduct, there must concur, first, a false representation or concealment of facts; second, it must be within the knowledge of the party making the one or concealing the other; third, the person affected thereby must be ignorant of the truth; fourth, the person seeking to influence the conduct of the other must act intentionally for that purpose; and, fifth, persons complaining shall have been induced to act by reason of such conduct of the other."); *Carragher v. Potts*, 686 S.E.2d 348, 351 (Ga. Ct. App. 2009) ("[A]n equitable estoppel is based on the ground of promoting the equity and justice of the individual case by preventing a party from asserting his rights under a general technical rule of law, when he has so conducted himself that it would be contrary to equity and good conscience for him to allege and prove the truth."); *Hollifield v. Monte Vista Biblical Gardens, Inc.*, 553 S.E.2d 662, 667 (Ga. Ct. App. 2001) ("In order for an equitable estoppel to arise, there must generally be some intended deception in the conduct or

declarations of the party to be estopped, or such gross negligence as to amount to constructive fraud, by which another has been misled to his injury.").

Nor does it appear that Plaintiffs waived their right to seek post-judgment interest simply by agreeing not to collect on the judgment against Mr. Park for five years while Plaintiffs pursued this bad faith action against Nationwide as Mr. Park's assignee.  The law does not infer the waiver of a right "unless 'the waiver is clear and unmistakable.'" *Vratsinas Const. Co. v. Triad Drywall, LLC*, 739 S.E.2d 493, 496 (Ga. Ct. App. 2013); *Eckerd Corp. v. Alterman Props., Ltd.*,  589 S.E.2d 660, 664 (Ga. Ct. App. 2003) ("A party may by his conduct waive a legal right but where the only evidence of an intention to waive is what a party does or forbears to do, there is no waiver unless his acts or omissions to act are so manifestly consistent with an intent to relinquish a then-known particular right or benefit that no other reasonable explanation of his conduct is possible.") (citation omitted).  "And because waiver is not favored under the law, the evidence relied upon to prove a waiver 'must be so clearly indicative of an intent to relinquish a then known particular right or benefit as to exclude any other reasonable explanation.'  Indeed, all the attendant facts, taken together, must amount to an "intentional relinquishment of a known right, in order that a waiver may exist." *Vratsinas Const. Co.*, 739 S.E.2d at 496 (2013) (citations omitted).  And even though Mr. Park, by virtue of the Assignment Agreement, would not have been obligated to pay the Camacho Family any interest automatically accruing on the judgment only during the five year stay period, the agreement did not operate to abate the interest.  *See Brightman*, 568 S.E.2d at 501 ("It is . . . undisputed that

Georgia law allows the insured to assign the cause of action to the holder of the excess liability judgment. It necessarily follows that the insured's avoidance of personal liability by the act of making the assignment does not defeat the cause of action. Exposure of the insured's assets to **_potential_** liability constitutes the element of damages.") (emphasis added).

### 5.    Calculation of damages including interest

Accordingly, for all of the foregoing reasons the Court finds Plaintiffs are entitled to post-judgment interest under O.C.G.A. § 7-4-12 as an element of damages in this bad faith action.  The parties debated in their briefing how to offset Nationwide's partial payment of its $100,000 policy limits and whether that partial payment should be offset for purposes of calculating the amount of post-judgment interest owed on the underlying state court judgment which is awarded here as an additional element of bad faith damages.  As explained above, in a bad faith action against an insured for its failure to settle, "the insured['s] assignee is entitled as a matter of law to recover damages equal to the amount by which the judgment exceeds policy coverage." *Brightman*, 568 S.E.2d at 501-02. Thus, in each of the cases discussed above at pages 34-37, 44-45, the damages sought and awarded included the underlying judgment minus the policy limits paid by the insurance company plus interest and costs.  As a result, Plaintiffs are not entitled to recover the entire $5,830,000 underlying judgment in this bad faith action.  Plaintiffs here are only entitled to $5,730,000 — the principal

amount of the judgment that exceeds the $100,000 policy limits subsequently paid by Nationwide.[24]

The parties disagreed over whether, under Georgia law (as opposed to Nationwide's policy language discussed above at page 41-45), Nationwide's partial payment of its $100,000 policy limits should be credited to the principal amount of the underlying judgment for purposes of calculating post-judgment interest.   Under O.C.G.A. § 7-4-17, "[w]hen a payment is made upon any debt, it shall be applied first to the discharge of any interest due at the time." *Threatt v. Forsyth County*, 585 S.E.2d 159, 163 (Ga. Ct. App. 2003) (holding that for the purpose of applying O.C.G.A. § 7-4-17 "judgments are debts and parties to litigation can be judgment debtors or creditors," and that O.C.G.A. § 7-4-17 "controls how payments for less than the full amount of a judgment should be allocated between principal and interest").   On February 23, 2011, the date Nationwide paid its $100,000 policy limits toward satisfaction of the judgment, $492,155.82 in interest[25] had accrued.   Thus, because Nationwide's payment of $100,000 was less than the $492,155.82 in accrued interest on the judgment as of February 23, 2011, the $100,000 partial payment did not reduce the principal amount and did not abate the accrual of additional interest on that amount.[26]   *Id.*

---

[24] It appears Plaintiffs themselves recognized this at some point.  In their original Motion for Entry of Judgment, Plaintiffs sought as damages the entire principal amount of the underlying judgment of $5,830,000.  In their supplemental brief, Plaintiffs modified their request to seek the remaining principal of the underlying excess verdict of $5,730,000 ($5,830,000 - $100,000).

[25] Interest = Principal x Rate x Time in years: $5,830,000 x 6.25% x (493 days/365 days).

[26] Had Nationwide wanted to reduce the amount of interest accruing on the judgment, it could have paid its $100,000 policy limits immediately after the judgment was entered and before any substantial amount of interest had accrued.  *See JTH Tax, Inc. v. Flowers*, 311 Ga. App. 495,

(holding that where payment toward judgment "was for less than the total amount of principal and interest . . . owed [t]hat payment, then, did not terminate the accrual of interest on the remaining principal").

While Plaintiffs in the bad faith action are entitled only to the principal amount of the judgment that exceeds the $100,000 policy limits – $5,730,000 – post-judgment interest as an additional element of bad faith damages accrued on the entire principal amount of the 2009 underlying wrongful death judgment of $5,830,000.  *See* O.C.G.A. § 7-4-12(a) (providing that judgments "bear annual interest upon the principal amount recovered . . ."); *see also Southern General Ins. Co. v. Ross*, 489 S.E. 2d at 56 (holding that policy language stating that insurer will pay "all interest" accruing on judgment against its insured requires an insurer to pay interest on the entire judgment amount) (citing 8A Appleman Ins. Law & Practice p. 79, § 4894.25 (1981 & Supp. 1997)).  In other words, because the insured is liable for all accrued post-judgment interest on an excess verdict, the insured (or here his assignee) is entitled to recover the entirety of that post-judgment interest because it is an additional "amount by which the judgment exceeds policy coverage." *E.g. Brightman*, 568 S.E.2d at 501-02.  Here,

---

497, 716 S.E.2d 559, 561 (2011) (holding that a judgment debtor may abate the accrual of interest by paying amount owed, and may abate the accrual of interest during appeal by complying with O.C.G.A. § 9-11-67 by "depositing with the court all or any part of such sum . . . to be held by the clerk of the court, subject to withdrawal, in whole or in part, at any time thereafter upon order of the court, upon posting of sufficient security"); *Threatt v. Forsyth Cnty.*, 552 S.E.2d 123 (Ga. Ct. App. 2001) ("*Threatt I*"); *Threatt*, 585 S.E.2d at 163; *see also United States v. Midwest Constr. Co.*, 619 F.2d 349, 353–354 (5th Cir. 1980) (construing similar FRCP 67 to require that in order to stop accrual of interest defendant must make money available to plaintiff without imposing conditions on its acceptance).

post-judgment interest accrued on an underlying wrongful death judgment of $5,830,000.

The parties also disagreed on how to calculate post-judgment interest. On the one hand, Plaintiffs appeared to calculate interest on a daily basis by multiplying a "daily interest rate" of $998.28 by 2,150 days — the number of days from October 19, 2009 (date of judgment in *Camacho v. Park*) and September 5, 2015 (date of jury verdict in *Camacho v. Nationwide*) — for a total of $2,146,302.00. (Mot., Doc. 178 at 2.) On the other hand, Defendants appeared to calculate interest on a hybrid annual/daily basis by "[a]pplying interest on an annual basis for 5 years and a per diem basis for the remain[ing]" 324 days for a total interest of $2,145,317.72. (Resp., Doc. 180 at 14.) Neither of these calculations are correct.

Under O.C.G.A. § 7-4-12, the underlying state court judgment accrued "annual interest upon the principal amount recovered at a rate equal to the prime rate as published by the Board of Governors of the Federal Reserve System, as published in statistical release H. 15 or any publication that may supersede it, on the day the judgment is entered plus 3 percent." O.C.G.A. § 7-4-12(a). In this case, the prime rate on the date of the October 19, 2009 judgment is 3.25%. Thus, the applicable interest rate is 6.25% (3.25% plus 3 percent). The amount of accrued annual post-judgment[27] interest *as of the date of this Order and Judgment* is $2,405,873.29, according to the following calculation:

---

[27] Despite the dicta in *St. Paul Reinsurance Co., Ltd. v. Ross*, 622 S.E.2d 374, 380-81 (Ga. Ct. App. 2005), that the award of post-judgment interest that automatically begins accruing on an

$$I = P \times R \times T$$

$I$ = accrued interest
$P$ = principal amount of underlying judgment (**$5,830,000**)
$R$ = interest rate (**6.25%**)
$T$ = time in years from entry of 10/19/09 judgment and 5/25/16 Order
(**2410 days/365 days**)

$$I = \$5,830,000 \times 6.25\% \times (2410/365)$$
$$I = \$2,405,873.29$$

Ordinarily, post-judgment interest would continue to accrue under O.C.G.A. § 7-4-12 on the principal amount of the underlying judgment, until the date it is paid. *Great Southern Midway v. Hughes*, 478 S.E. 2d 400, 401-402 (Ga. Ct. App. 1996) (citing O.C.G.A. § 7-4-12 and stating that "[t]his post-judgment interest is due from the date the judgment is entered until the date the judgment is paid"). However, the interest awarded here under O.C.G.A. § 7-4-12 is an element of Plaintiffs' damages in this bad faith action. Although it is post-

---

underlying tort judgment pursuant to O.C.G.A. § 7-4-12(c), and which a tort judgment creditor may later seek in a separate action "is more akin to a request for pre-judgment interest because the judgment creditor seeks to recover interest running from before the trial court enters judgment in the [separate] action and, in fact, from before the [separate] action was even commenced," Plaintiffs here are not seeking pre-judgment interest and both Plaintiffs and Nationwide expressly disavowed any award of pre-judgment interest in this case in their Supplemental Briefing. Under Georgia law, O.C.G.A. § 7-4-15, "[a]ll liquidated demands, where by agreement or otherwise the sum to be paid is fixed or certain, bear interest from the time the party shall become liable and bound to pay them; if payable on demand, they shall bear interest from the time of the demand." "Under this statute, prejudgment interest—which flows automatically from a liquidated demand—is to be awarded upon a judgment for a liquidated amount. Thus, as long as there is a demand for prejudgment interest prior to the entry of final judgment, a trial court should award it." *Crisler v. Haugabook*, 725 S.E. 2d 318, 319 (Ga. 2012) (comparing *Holloway v. State Farm Fire Co.*, 537 S.E.2d 121 (Ga. Ct. App. 2000) (award of prejudgment interest for liquidated damages is mandatory, not discretionary, and awarded as a matter of law) *with First Bank & Trust Co. v. Insurance Service Assn.*, 269 S.E.2d 527 (Ga. Ct. App. 1980) (trial court did not err in failing to include prejudgment interest in granting summary judgment in absence of demand in complaint or amendment thereto). Thus, a party must make a demand for prejudgment interest in their complaint before interest can be awarded under O.C.G.A. § 7-4-15. *Id.*; *see also Great Am. Ins. Co. v. Int'l Ins. Co.*, 753 F. Supp. 357, 364 (M.D. Ga. 1990) (granting excess insurer's claim for prejudgment interest under O.C.G.A. § 7-4-15 on settlement payment of $500,000 in underlying liability action as part of judgment in subsequent action for bad faith failure to settle against primary insurer).

judgment interest that accrued automatically on the underlying judgment, it is compensation in this bad faith action and ceases to accrue once the judgment in this federal action is entered. *See Gurley v. Lindsley*, 466 F.2d 498, 499 (5th Cir. 1972) (differentiating between penalty interest that continues to accrue until paid and interest awarded as damages and holding that "interest as an element of damages runs from the time the cause of action accrues until the time of judgment") (citing *Montgomery Ward & Co. v. Collins Estate, Inc.*, 268 F.2d 830, 838 (4th Cir. 1959)); *cf. Morley v. Lake Shore & M.S. Ry. Co.*, 146 U.S. 162, 168 (1892) ("If the state declares that, in case of the breach of a contract, interest shall accrue, such interest is in the nature of damages, and, as between the parties to the contract, such interest will continue to run until payment, or until the owner of the cause of action elects to merge it into judgment.").  As interest on the underlying wrongful death judgment is an element of compensation and damages in this bad faith action, any additional interest under O.C.G.A. § 7-4-12 ceases to accrue once it becomes part of the judgment here.[28]

Finally, Nationwide is correct that the bad faith judgment will start accruing post-judgment interest once it is entered under the federal post-judgment interest rate set forth in 28 U.S.C. § 1961.  This judgment will accrue interest under 28 U.S.C. § 1961 "calculated from the date of the entry of the

---

[28] Otherwise, double interest would accrue concurrently on the underlying judgment once it became part of this judgment — interest under O.C.G.A. § 7-4-12 and interest under 28 U.S.C. § 1961.

judgment,[29] at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment [and] shall be computed daily to the date of payment . . . and shall be compounded annually."[30] 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."); 28 U.S.C.A. § 1961 (b); *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1053 (11th Cir. 1994) (finding that post-judgment interest under 28 U.S.C. § 1961 is mandatory).   The applicable weekly average for the week ending May 20, 2016 (the week preceding this judgment) is .62%.[31]

Nationwide asserts that an award of post-judgment interest under 28 U.S.C. § 1961 on the underlying judgment as part of the judgment entered in this action will require Nationwide to pay interest on interest in violation of Georgia law.  O.C.G.A. § 9-12-10, which provides that "[i]n all cases where judgment is obtained . . . [n]o part of the judgment shall bear interest except the principal which is due on the original debt," is inapplicable to this case.  First, the Eleventh Circuit has held that, "in awarding postjudgment interest in a diversity case, a district court will apply the federal interest statute, 28 U.S.C. § 1961(a), rather than the state interest statute." *Ins. Co. of N. Am. v. Lexow*, 937 F.2d 569, 572 n.4

---

[29] "Interest is not calculated from the return of an initial verdict but from the date of the eventual district-court judgment." 16AA Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Juris. § 3983 (4th ed. 2016).

[30] An explanation of how to determine the applicable rate of post judgment interest is found on the federal court's official website at http://www.uscourts.gov/services-forms/fees/post-judgement-interest-rate.

[31] *See* http://www.federalreserve.gov/releases/h15/current/.

(11th Cir. 1991) (citing *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1542 (11th Cir. 1985)).   Secondly, Plaintiffs are entitled to post-judgment interest under section 1961(a) on the entire judgment entered in this case, including interest given as an element of damages.  *Id.* (finding that postjudgment interest should be awarded on the entire amount of the judgment, including award of prejudgment interest); *see also Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 586 (6th Cir. 2002); *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1031 (4th Cir. 1993) (en banc); *Bancamerica Commercial Corp. v. Mosher Steel of Kans., Inc.*, 103 F.3d 80, 82 (10th Cir. 1996); *Air Separation, Inc. v. Underwriters at Lloyd's of London*, 45 F.3d 288, 291 (9th Cir. 1995).  As the Supreme Court and the Eleventh Circuit have explained, "[t]he purpose of postjudgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36 (1990) (quotation omitted); *Lexow*, 937 F.2d at 572 n. 4 ("[P]ost-judgment interest serves to reimburse the claimant for not having received the money in hand on that day.").  "This is effectuated by the federal statute providing interest on all federal court judgments. 28 U.S.C. § 1961. This is to be distinguished from [other] interest, which forms part of the actual amount of a judgment on a claim." *Lexow*, 937 F.2d at 572 n. 4 (quoting *FIGA v. R.V.M.P. Corp.*, 874 F.2d 1528, 1533 (11th Cir. 1989)).  The interest awarded under O.C.G.A. § 7-4-12 is an element of damages in a bad faith action because it is part of the financial liability to which the insured is left exposed as a result of the insurer's actions.  Because it

is properly considered compensation and is therefore part of the underlying damage award, the failure to award postjudgment interest on this "interest" element of the damages award would require the Plaintiffs to bear the cost of the lost time value of the award resulting from the Defendant's delay in remitting payment. *Id.*; *Caffey*, 302 F.3d at 586.

## III.   Plaintiffs' Request for Attorney's Fees Under O.C.G.A. § 9-11-68

In addition to their claims for damages and post-judgment interest, Plaintiffs also seek an award of attorney's fees under O.C.G.A. § 9-11-68. However, Plaintiffs requested and were granted a deferment of the deadline for their submission of a request for attorney's fees and expenses of litigation pursuant to the timeline authorized by O.C.G.A. § 9-11-68, after either (1) the running of the period for an appeal or (2) after an appeal and remittitur affirming the judgment. *See* O.C.G.A. § 9-11-68(d)(1) ("The court shall order the payment of attorney's fees and expenses of litigation upon receipt of proof that the judgment is one to which the provisions of . . . this Code section apply; provided, however, that if an appeal is taken from such judgment, the court shall order payment of such attorney's fees and expenses of litigation only upon remittitur affirming such judgment.")  Nationwide objects to the "bifurcation of Plaintiffs' O.C.G.A. § 9-11-68 claim from the damages determination" arguing that "it will result in a non-final order that cannot be appealed."  (Resp., Doc. 180 at 15.)

In *Budinich v. Becton Dickinson & Co.*, the United States Supreme Court held that a decision on the merits is a "final decision" for purposes of jurisdiction on appeal under 28 U.S.C. § 1291, even if the award or amount of attorney's fees

for the litigation remains to be determined.   486 U.S. 196, 201-02 (1988)
(acknowledging that statutory or decisional law authorizing the fees might
sometimes treat the fees as part of the merits, but holding that considerations of
"operational consistency and predictability in the overall application of § 1291"
favor a "uniform rule that an unresolved issue of attorney's fees for the litigation
in question does not prevent judgment on the merits from being final").
Subsequently, in *Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of
Operating Eng'rs & Participating Emp'rs*, the Supreme Court granted *cert* to
resolve a circuit split over "whether a different result obtains if the unresolved
claim for attorney's fees is based on a contract rather than, or in addition to, a
statute."  134 S. Ct. 773, 777 (2014).   The Court held that for purposes of an
appeal pursuant to § 1291, "the result is not different. Whether the claim for
attorney's fees is based on a statute, a contract, or both, the pendency of a ruling
on an award for fees and costs does not prevent, as a general rule, the merits
judgment from becoming final for purposes of appeal."  *Id.*  In so holding, the
Court rejected the assertion that such an outcome ran afoul of the importance of
avoiding piecemeal litigation:

> The Court was aware of piecemeal litigation concerns in *Budinich*,
> but it still adopted a uniform rule that an unresolved issue of
> attorney's fees for the litigation does not prevent judgment on the
> merits from being final. Here it suffices to say that the [] concern
> over piecemeal litigation, though starting from a legitimate principle,
> is counterbalanced by the interest in determining with promptness
> and clarity whether the ruling on the merits will be appealed. This is
> especially so because claims for attorney's fees may be complex and
> require a considerable amount of time to resolve.

*Id.* at 781.   Accordingly, Nationwide's objections aside, the Court may enter judgment on the merits of Plaintiffs' bad faith tort claim while reserving the issue of attorney's fees without preventing Nationwide from appealing this judgment.

In their Reply, Plaintiffs contend although the Court cannot determine the amount of fees at this juncture under O.C.G.A. § 9-11-68(d)(1), there is no clear bar to determining Plaintiffs' entitlement to fees under O.C.G.A. § 9-11-68(b)(2) for purposes of appeal.   As a matter of judicial economy, the Court determines whether Plaintiffs are entitled to an award of attorney's fees under O.C.G.A. § 9-11-68(b)(2), consistent with the express limitations of O.C.G.A. § 9-11-68(d)(1) which only prohibits the court from ordering *payment* of attorney's fees and expenses of litigation under subsection (b) of the statute until after appeal and the judgment is affirmed.

Under O.C.G.A. § 9-11-68(b)(2), "[i]f a plaintiff makes an offer of settlement which is rejected by the defendant and the plaintiff recovers a final judgment in an amount greater than 125 percent of such offer of settlement, the plaintiff shall be entitled to recover reasonable attorney's fees and expenses of litigation incurred by the plaintiff or on the plaintiff's behalf from the date of the rejection of the offer of settlement through the entry of judgment."   The "clear purpose" of the statute "is to encourage litigants in tort cases to make and accept good faith settlement proposals in order to avoid unnecessary litigation," thereby advancing "this State's strong public policy of encouraging negotiations and settlements." *Georgia Dep't of Corr. v. Couch*, 759 S.E.2d 804, 807 (Ga. 2014)

(quoting *Smith v. Baptiste*, 694 S.E.2d 83 (Ga. 2010)).   The Georgia Supreme

Court recently explained how O.C.G.A. § 9–11–68 applies:

> The statute applies to a written offer to settle a tort claim made more
> than 30 days after the service of the summons or complaint but not
> less than 30 days before trial . . . *See* OCGA § 9–11–68(a)
> (enumerating the requirements for such an offer), [§ 9-11-68](c)
> (discussing additional procedures and interpretive rules for offers
> and their acceptance or rejection). [S]ubsection (b), explains when a
> defendant or plaintiff is entitled to an award . . . Subsection (d) then
> directs that, unless the trial court determines 'that [the] offer was not
> made in good faith in an order setting forth the basis for such a
> determination,' the court must order such an award 'upon receipt of
> proof that the judgment is one to which ... subsection (b) of this Code
> section appl[ies]; provided, however, that if an appeal is taken from
> such judgment, the court shall order payment of such attorney's fees
> and expenses of litigation only upon remittitur affirming such
> judgment.'

*Couch*, 759 S.E.2d at 808 (quoting O.C.G.A. §§ 9–11–68(b)&(d)).

Plaintiffs'   §   9–11–68   offer   of   settlement   satisfies   the   statutory

preconditions for an award of attorney fees and litigation expenses. Plaintiffs

filed this lawsuit on September 14, 2011, and served Nationwide two days later on

September 16, 2011.   (*See* Docs. 1, 4.)   On November 11, 2011,[32] nearly sixty days

after filing the Complaint, Plaintiffs served Nationwide with an Offer of

Settlement Pursuant to O.C.G.A. § 9–11–68.   (Doc. 178-3.)   Plaintiffs offered to

settle the claim for $4,583,000, including all attorney's fees and other expenses

"which are or could be part of any of the Plaintiffs' claims."   (*Id.*)   The offer was

open for acceptance and payment for 30 days.   Nationwide did not respond to the

offer, rendering the offer rejected pursuant to O.C.G.A. § 9–11–68(c).   O.C.G.A. §

---

[32] According to the proof of delivery filed by Plaintiffs, Nationwide received the Offer of
Settlement on November 14, 2011.  (Doc. 178-4.)

9–11–68(c) ("An offer that is neither withdrawn nor accepted within 30 days shall be deemed rejected."); *Couch*, 759 S.E.2d at 808. As a result, the parties litigated the case for four more years and the case was tried before a jury for six days beginning September 8, 2015. The trial resulted in a verdict in favor of Plaintiffs on liability and entry of judgment by this Court as a matter of law for $5,730,000.00 in principal plus interest through the date of this judgment as additional damages of $2,405,873.29, for a total judgment of $8,135,873.29. As Plaintiffs' $8,135,873.29 judgment far exceeds 125% of their rejected offer ($4,583,000 x 1.25 = $5,728,750), Plaintiffs are entitled to an award of attorney fees and litigation expenses under O.C.G.A. § 9–11–68(b)(2).

Nationwide asserts that Plaintiffs are not entitled to attorney's fees under O.C.G.A. § 9-11-68 because: (1) O.C.G.A. § 9-11-68 only applies to tort claims and the Camacho's claim for bad faith is more akin to a contract claim; and (2) Plaintiffs settlement offer was not made in good faith. As explained above, this Court has already rejected Nationwide's arguments that Plaintiffs' bad faith claim is actually a contract claim. It is a tort claim and is therefore subject to the provisions of O.C.G.A. § 9-11-68. And Nationwide is simply incorrect that where "damages in a bad faith action are liquidated in the form of the excess verdict," such an award confirms the contractual nature of the claim because "the *sine qua non* of a tort claim . . . is that it is a claim for *unliquidated* damages." (Resp., Doc. 180 at 16.) "A liquidated claim is 'an amount certain and fixed, either by the act and agreement of the parties or *by operation of law,'* which cannot be changed by proof." *Home Ins. Co. v. N. River Ins. Co.*, 385 S.E.2d 736, 741 (Ga. Ct. App.

1989)[33] (emphasis added); *First National Bank v. State Highway Dep't*, 132 S.E.2d 263, 266 (Ga. 1963); *Gen. Elec. Credit Corp. v. Strickle Properties*, 861 F.2d 1532, 1537 (11th Cir. 1988) (citing Georgia law.)  "Conversely, a claim is unliquidated when there is a bona fide contention as to the amount owing." *Home Ins. Co.*, 385 S.E.2d at 741 (citations omitted). As explained above, it is well established in Georgia that damages in a bad faith failure to settle tort action are determined as a matter of law based on the excess verdict.  *E.g., Brightman*, 568 S.E.2d at 456.  As liquidated damages are not limited to claims based in contract and may be awarded in tort actions where damages are certain and fixed by operation of law, including tort actions for negligent/bad faith failure to settle, the Court rejects Nationwide's argument that O.C.G.A. § 9-11-68 is inapplicable here.

Nationwide asserts that Plaintiffs' Offer of Settlement was not made in good faith because; (1) it was made "at the very outset of this case . . . to get the clock ticking on attorney's fees" because Plaintiffs knew Nationwide would reject the offer and contest liability; (2) the offer of $4,583,000 is just shy of 125% ($5,728,750) of the *excess* portion of the underlying judgment of $5,730,00 ($5,830,000 minus the $100,000 policy limits); and (3) Plaintiffs "knew that a

---

[33] *Home Ins. Co. v. N. River Ins. Co.*, involved a claim by an excess insurer subrogated to an insured's rights against a primary insurer for negligent/bad faith failure to settle a claim by the primary insurer.  Although, the appeals court determined that the trial court erred in awarding prejudgment interest because the requested damages were not liquidated, the decision was subsequently distinguished by the Court of Appeals in *Brightman* which held that "after an insurer's liability for wrongful refusal to settle a claim against its insured is established, the insured or its assignee is entitled as a matter of law to recover damages equal to the amount by which the judgment exceeds policy coverage. Where, as here, these are the only damages sought, damages are liquidated." 568 S.E.2d at 456 (distinguishing *Home Ins. Co.* as seeking additional damages).

favorable verdict would net a judgment in excess of 125%" of the $4,583,000 offer so that "any verdict in their favor was guaranteed to secure fees under this statute.[34]" (Resp., Doc. 180 at 17-18.)

Even where a party is entitled to recover attorney fees and expenses of litigation under O.C.G.A. § 9–11–68(b), "the court may determine that [a settlement] offer was not made in good faith in an order setting forth the basis for such a determination. In such case, the court may disallow an award of attorney ... fees and costs." O.C.G.A. § 9–11–68(d); *e.g., Great W. Cas. Co. v. Bloomfield*, 721 S.E.2d 173, 174-75 (Ga. Ct. App. 2011) (noting that if the judgment meets the requirements of O.C.G.A. § 9–11–68(b), the trial court then has the discretion under O.C.G.A. § 9–11–68(d)(2) to determine whether or not the offer was made in good faith and whether to disallow the fee award).  Whether an offer of settlement was made in good faith is a "factual determination, based on the trial court's assessment of the case, the parties, the lawyers, and all of the other factors that go into such a determination, which the trial court has gathered during the progress of the case." *Bloomfield*, 721 S.E.2d at 176.

The fact that Plaintiffs made their offer of settlement early in the litigation, and prior to commencement of discovery, is not indicative of bad faith.  Indeed, the statute permits offers of settlement to be made within 30 days of the service of summons and the complaint on the defendant.  O.C.G.A. § 9-11-68(a).  In addition, Nationwide argues that Plaintiffs' offer evinces bad faith because it was

---

[34] Interestingly, by its assertion here, Nationwide admits to the fallacy of its arguments challenging the award of the excess judgment as damages in this bad faith action.

almost exactly 125% of the underlying excess verdict, thus guaranteeing an award of fees, and was thus intended to strong arm Nationwide into ceding liability.  In light of the purpose of the statute, these arguments ring hollow.  In *Smith v. Baptiste*, the Georgia Supreme Court upheld the constitutionality of O.C.G.A. § 9-11-68, over an objection by plaintiffs who were subject to payment of the defendant's attorneys fees after losing the case on summary judgment.  694 S.E.2d 83, 87 (Ga. 2010).  The Court rejected a challenge that requiring the unsuccessful litigant to pay the prevailing party's attorney fees infringed on the constitutional guarantee that "[n]o person shall be deprived of the right to prosecute or defend, either in person or by an attorney, that person's own cause in any of the courts of this state." Ga. Const. Art. I, Sec. I, Par. XII).  The Court held that O.C.G.A. § 9–11–68(b) does not deny litigants of the right to prosecute or defend actions in the courts, "but simply sets forth certain circumstances under which attorney's fees may be recoverable." *Id.* at 87.  "The clear purpose of this general law is to encourage litigants in tort cases to make and accept good faith settlement proposals in order to avoid unnecessary litigation. . . . This is certainly a legitimate legislative purpose, consistent with this State's "strong public policy of encouraging negotiations and settlements." *Id.* at 88 (citations omitted); *see also id.* at 93-94 (Nahmias, J., concurring) ("Litigants remain free to file and defend tort cases, even if they receive a settlement offer and even if they elect to reject the offer. There is also little question that O.C.G.A. § 9–11–68 is rationally related to the State's legitimate objective of "encourag[ing] litigants in tort cases to make and accept good faith settlement proposals in order to avoid

unnecessary litigation. . . . Nor can a credible argument be made, at least on the record in this case, that the statute substantially impedes, or 'chills,' litigants from filing and pursuing their claims, in violation of due process or equal protection.")  As Justice Nahmias opined in his concurring opinion in *Smith v. Baptiste*,

> O.C.G.A. § 9–11–68 [] reflects the 'policy of Georgia,' . . . that continuing tort litigation after rejecting a good faith settlement offer may constitute "wanton or excessive indulgence in litigation" and authorize "the burdening of one [litigant] with the counsel fees of the other" incurred after that rejection, [] if the ultimate judgment, after such continued litigation, is significantly lower than the settlement offer. This legislative policy judgment, one of many departing from the American Rule, is entitled to substantial deference from this Court.

*Id.* at 96 (Nahmias, J., concurring).

The Court finds that Plaintiffs' Offer of Settlement made pursuant to O.C.G.A. § 9–11–68, offering to settle their claim for Nationwide's negligent/bad faith failure to settle the underlying wrongful death action at a substantial discount from the excess judgment plus interest, was made in good faith. Accordingly, Plaintiffs are entitled to an award of reasonable attorney's fees and expenses under O.C.G.A. § 9–11–68, to be determined after either the time for appeal of this judgment has run, or upon remittitur from the Court of Appeals in the event the judgment is affirmed.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Entry of Judgment [Doc. 178] is **GRANTED** in part and **DENIED** in part.  The Clerk is **DIRECTED** to enter Judgment in favor of Plaintiffs as follows:

(1) **Excess Judgment Damages**: the remaining principal amount of the underlying excess judgment of $5,730,000;

(2) **Underlying Interest Damages**: statutory interest on the entire principal amount of the state court judgment under O.C.G.A. § 7-4-12 in the amount of $2,405,873.29, as of the date of this Order and Judgment;

(3) **Post-judgment Interest**: post-judgment interest pursuant 28 U.S.C. § 1961 at the rate specified therein on the entire amount of this judgment.

The Court defers ruling on the amount of Plaintiffs' attorney's fees under O.C.G.A. § 9-11-68.  The Court **DIRECTS** Plaintiffs to submit their request for fees under O.C.G.A. § 9-11-68 within 30 days of expiration of the appeal period, or within 30 days of remitter on appeal.  This judgment is certified as final under Fed. R. Civ. P. 54 for purposes of appeal under 28 U.S.C. § 1291.

**IT IS SO ORDERED** this 25th day of May, 2016.


**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**